Alberta BROADEN, Individually and on behalf of all others similarly situated, Frankie Mae Jeter, Individually and as Executive Director of Welfare Rights Organization of Allegheny County, a non profit corporation, N.A.A.C.P. Pittsburgh Chapter, a non profit corporation and People's Oakland, a non profit corporation, Plaintiffs,

v.

Patricia HARRIS, Individually and in her official capacity as Secretary of Housing and Urban Development, the Department of Housing and Urban Development, Paul T. Cain, Individually and in his official capacity as Executive Director of the Pittsburgh Area Office of Housing and Urban Development, Robert C. Embry, Assistant Secretary of the Department of Housing and Urban Development for Community Development, City of Pittsburgh, Richard Caliguiri, in his official capacity as Mayor of the City of Pittsburgh, Stephen Reichstein, Administrator of the Community Development Program for the City of Pittsburgh, Southwestern Pennsylvania Regional Planning Commission and A. B. Kenny, in his capacity as Chairman of S.P.R.P.C., Defendants.

Civ. A. No. 77–899.

United States District Court,
W. D. Pennsylvania.

May 3, 1978.

As Amended July 5, 1978.

Frank I. Smizik, Neighborhood Legal Services, Pittsburgh, Pa., for plaintiffs.

Lenore C. Garon, U. S. Dept. of Justice, Washington, D.C., John P. Panneton, Asst. U. S. Atty., Pittsburgh, Pa., for federal defendants.

Marvin A. Fein, Asst. Sol., Pittsburgh, Pa., for city defendants.

Robert N. Hackett, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Pittsburgh, Pa., for S.P.R.P.C. and Chairman.

## OPINION

SNYDER, District Judge.

A low income, minority resident of the City of Pittsburgh and three community organizations seek declaratory and injunctive relief against the Department of Hous-

ing and Urban Development (HUD), the Southwestern Regional Planning Commission (SPRPC), and the City of Pittsburgh, its Mayor, and the Administrator of its Community Development Program, challenging the City's 1975, 1976 and 1977 Community Development Block Grant Programs (CDBG) and the approval thereof by SPRPC and HUD. Plaintiffs claim the City Programs violate the Housing and Community Development Act of 1974 (HCDA), 42 U.S.C. § 5301 *et seq.* (Supp. V 1975), in failing to allocate sufficient resources to the needs of low income families and renters, in allocating funds to activities which Plaintiffs view as ineligible for CDBG funding, in failing to comply with community participation requirements in the formulation of the Programs, and in failing to comply with the reporting requirements and performance standards.

Plaintiffs seek a declaration that Defendants have violated HCDA and an injunction to require approval of a program comporting with their interpretation of HCDA. Plaintiffs also seek improved monitoring of performance by the City and of HUD's review functions, and pray that HUD be required to amend its regulations to comply with legislative intent concerning review of recipient performance. The Defendants have moved for Summary Judgment; the Motions will be granted.

## I. THE STATUTORY BACKGROUND

The Housing and Community Development Act of 1974, Title I, the provisions of which are at issue here, established a system of federal assistance for HUD administered community development activities, consolidating ten community development programs into a single block grant program.[1] The Administration had originally proposed legislation in the form of revenue

1. The ten programs were: The Public Facilities Loan Program authorized by Title II of the Housing Amendments of 1955, the Open Space Program authorized by Title VII of the Housing Act of 1961, The Planning Advance Program authorized by Section 702 of the Housing Act of 1954, Basic Water and Sewer Facilities, Neighborhood Facilities and Advance Acquisi-
tion of Land Programs authorized under Title VII of the Housing and Urban Development Act of 1965, The Urban Renewal, Code Enforcement and Neighborhood Development Program authorized by Title I of the Housing Act of 1949, and the Model Cities Program authorized by Title I of the Demonstration Cities and Metropolitan Development Act of 1966.

sharing programs that would automatically allocate funds to communities based on objective need criteria, without requiring the formal application of review process. A compromise bill was enacted which required application to obtain funds, but which contemplated that "local elected officials, rather than special purpose agencies, would have principal responsibility for determining allocating resources." H.R. 93–1114 at 3. The Act simplified application require-

ments and limited the role of the Secretary in approving applications for funds. It specified requirements for application and certain restrictions on the use of funds, but it placed heavy reliance on certifications by local officials as to the allocation of funds. The emphasis of HUD review was placed on post-audit review of a locality's performance under the grant.

Section 5304(a)[2] of the Act sets forth the application requirements. It requires that

**2.** 42 U.S.C. § 5304(a) provides:

(a) No grant may be made pursuant to section 5306 of this title unless an application shall have been submitted to the Secretary in which the applicant—

(1) sets forth a summary of a three-year community development plan which identifies community development needs, demonstrates a comprehensive strategy for meeting those needs, and specifies both short- and long-term community development objectives which have been developed in accordance with areawide development planning and national urban growth policies;

(2) formulates a program which (A) includes the activities to be undertaken to meet its community development needs and objectives, together with the estimated costs and general location of such activities, (B) indicates resources other than those provided under this chapter which are expected to be made available toward meeting its identified needs and objectives, and (C) takes into account appropriate environmental factors;

(3) describes a program designed to—

(A) eliminate or prevent slums, blight, and deterioration where such conditions or needs exist; and

(B) provide improved community facilities and public improvements, including the provision of supporting health, social, and similar services where necessary and appropriate;

(4) submits a housing assistance plan which—

(A) accurately surveys the condition of the housing stock in the community and assesses the housing assistance needs of lower-income persons (including elderly and handicapped persons, large families, and persons displaced or to be displaced) residing in or expected to reside in the community,

(B) specifies a realistic annual goal for the number of dwelling units or persons to be assisted, including (i) the relative proportion of new, rehabilitated, and existing dwelling units, and (ii) the sizes and types of housing projects and assistance best suited to the needs of lower-income persons in the community, and

(C) indicates the general locations of proposed housing for lower-income persons, with the objective of (i) furthering the revitalization of the community, including the restoration and rehabilitation of stable neighborhoods to the maximum extent possible, (ii) promoting greater choice of housing opportunities and avoiding undue concentrations of assisted persons in areas containing a high proportion of low-income persons, and (iii) assuring the availability of public facilities and services adequate to serve proposed housing projects;

(5) provides satisfactory assurances that the program will be conducted and administered in conformity with Public Law 88–352 and Public Law 90–284; and

(6) provides satisfactory assurances that, prior to submission of its application, it has (A) provided citizens with adequate information concerning the amount of funds available for proposed community development and housing activities, the range of activities that may be undertaken, and other important program requirements, (B) held public hearings to obtain the views of citizens on community development and housing needs, and (C) provided citizens an adequate opportunity to participate in the development of the application; but no part of this paragraph shall be construed to restrict the responsibility and authority of the applicant for the development of the application and the execution of its Community Development Program.

Implementing regulations for the Secretary's approval of applications appear in 24 C.F.R. § 570.306:

(a) *Acceptance of application.* (1) Upon receipt of an application, the HUD Area Office will accept it for review, provided that:

(i) It has been received before the deadline for receipt of applications established in § 570.-300(a);

(ii) The application requirements specified in § 570.303 are complete, except with regard to those applications for which certain submission requirements are waived pursuant to § 570.304;

(iii) The funds requested do not exceed the entitlement amount;

(iv) Any comments and recommendations received from clearinghouses are attached to the application; and

the application contain a three-year community development plan identifying community development needs and objectives and a strategy to meet them; a program which includes activities to meet these needs and objectives and identifies other resources available to fund them; a program specifically designed to eliminate or prevent slums, blight and deterioration and provide improved community facilities and services; and a housing assistance plan (HAP) which accurately surveys the housing stock and assesses housing assistance needs of lower-income people residing in or expected to reside in the community, sets a realistic goal for the number of units and persons to be assisted, and indicates the general location of proposed housing for lower-income persons.

This section further provides for satisfactory assurances, prior to submission of the application, that citizens were given adequate information concerning the funds available, the range of activities that may be undertaken, and other important aspects of program requirements; that public hearings were held to obtain the views of the citizenry; and that citizens were given ade-

(v) The applicant's performance report for the previous fiscal year has been submitted as required by § 570.300(d). (2) If the application is accepted in accordance with the preceding paragraph, the date of acceptance of the application will be the date of receipt of the application in the HUD field office, and the applicant will be so notified in writing. If the application is not accepted for review, the applicant will be so notified in writing, and will be advised of the specific reasons for nonacceptance.

(b) *Scope of review.* (1) The Secretary will normally base his review upon the applicant's certifications, statements of facts and data and other programmatic decisions. The Secretary reserves the right, however, to consider substantial evidence including significant facts and data, in accordance with the review criteria in this section, which challenges the certifications, statements of facts and data, and other programmatic decisions, and to require additional information or assurances from the applicant as warranted by such evidence.

(2) Based on that review, the Secretary will approve the application unless:

(i) On the basis of significant facts and data, generally available (whether published data accessible to both the applicant and the Secretary, such as census data, and other data available to both the applicant and the Secretary, such as recent local, areawide or State comprehensive planning data) and pertaining to community and housing needs and objectives, the Secretary determines that the applicant's description of such needs and objectives is plainly inconsistent with such facts and data; or

(ii) On the basis of the application, the Secretary determines that the activities to be undertaken are plainly inappropriate to meeting the needs and objectives identified by the applicant; or

(iii) The Secretary determines that the application does not comply with the requirements of this Part or other applicable law, or proposes activities which are ineligible under this Part.

(c) *Approval or disapproval of application.* Within seventy-five days of the date of receipt of the application, or at such earlier time as review is completed, the Secretary will notify the applicant in writing that the application has been either approved, or disapproved. In the event the Secretary has not mailed a notification to the applicant within seventy-five days from the date of acceptance of a complete application that it has been disapproved, the application shall be deemed to be approved. If the application is disapproved, the applicant shall be informed of the specific reasons for disapproval.

(d) *Approval of less than full entitlement.* In addition to the adjustments authorized under § 570.911, the Secretary may also adjust the entitlement amount to the extent identified in an application submitted under this part designated for an activity or activities that are not eligible under § 570.200, and the deficiency has not been corrected prior to the expiration of the 75–day review period for the application. Funds not approved will be reallocated pursuant to § 570.107.

(e) *Conditional approval.* The Secretary may make a conditional approval, in which case the full entitlement amount will be approved but the obligation and utilization of funds for affected activities will be restricted. Conditional approvals will be made only where:

(1) Local environmental reviews under § 570.603 have not yet been completed; or

(2) The requirements of § 570.607 regarding the provision of public services or flood or drainage facilities have not yet been satisfied; or

(3) There is substantial evidence that there has been, or there will be, a lack of substantial progress, nonconformance, noncompliance, or a lack of continuing capacity, as described in § 570.909. In such case, the reasons for the conditional approval and the actions necessary to remove the condition shall be specified. Failure to satisfy the condition may result in a reduction in the annual grant pursuant to § 570.910(b)(10).

quate opportunity to participate in the development of the application. The application must also contain assurances that the program will be administered in conformity with the Civil Rights Acts of 1964 and 1968, and Section 5309 of the Act, which itself expressly prohibits discrimination. Applicants must also first submit the application to state and areawide clearinghouses for review, in accord with OMB Circular A–95. 24 C.F.R. § 570.400(d). Section 5304(b) sets forth additional requirements, including certification by the applicant that maximum feasible priority has been given to activities that benefit low or moderate income families or aid in the prevention or elimination of slums and blight. Section 5304(b)(2).

Section 5304(c) provides that the Secretary

> shall approve an application . . . unless—
>
> (1) on the basis of significant facts and data, generally available and pertaining to community and housing needs and objectives, the Secretary determines that the applicant's description of such needs and objectives is plainly inconsistent with such facts or data; or
>
> (2) on the basis of the application, the Secretary determines that the activities to be undertaken are plainly inappropriate to meeting the needs and objectives identified by the applicant pursuant to subsection (a) of this section; or
>
> (3) the Secretary determines that the application does not comply with the re-

quirements of this title or other applicable law or proposes activities which are ineligible under this title.

Unless the Secretary notifies the applicant of specific reasons for disapproval within 75 days of receipt of the application, the application is deemed approved. Section 5304(f).

Prior to each fiscal year, a grantee must submit a performance report to the Secretary. Section 5304(d). At least on an annual basis, the Secretary must make such reviews as necessary to determine whether the grantee has carried out a program substantially as described in the application, whether the program conformed to the requirements of the Act and other laws, and whether the grantee has the capacity to continue to carry out the program in a timely manner. According to her findings upon such review, the Secretary may make adjustments in the amount of annual grants. Section 5311(a) requires her, if after notice and hearing she finds that a grantee has failed to comply with the Act, to terminate, reduce or limit payments until compliance is secured. If she believes noncompliance has been substantial, she is authorized to refer the matter to the Attorney General who may seek restitution or injunctive relief.

## II. THE FACTUAL BACKGROUND

On February 18, 1975, HUD's Pittsburgh Area Office received the City's first year CDBG application for $16,429,000 [3] in feder-

**3.** The full budget called for:

| "E. PROGRAM ACTIVITY | | |
|---|---|---|
| 1. ACQUISITION OF REAL PROPERTY | Only this amount can be estimated at this time. Additional acquisition anticipated to be very small. | $ 150,000 |
| 2. PUBLIC WORKS, FACILITIES, SITE IMPROVEMENTS | | $5,415,000 |
| 3. CODE ENFORCEMENT | . | $ 175,000 |
| 4. CLEARANCE, DEMOLITION, REHABILITATION | | $1,286,000 |
| 5. REHABILITATION LOANS AND GRANTS | | $5,400,000 |
| 6. SPECIAL PROJECTS FOR ELDERLY AND HANDICAPPED | | |
| 7. PAYMENTS FOR LOSS OF RENTAL INCOME | | |
| 8. DISPOSITION OF REAL PROPERTY | | |
| 9. PROVISION OF PUBLIC SERVICES | | |
| 10. PAYMENT OF NON–FEDERAL SHARES | | |

al entitlement funds, $5,660,440 of which was designated for housing-related activi-ties.[4] The application included a housing assistance plan, and identified non-CDBG

| | | | | | |
|---|---|---|---|---|---|
| | (n) Design | A–15 | (n) | 12,000 | |
| | (n) Interest | UR 7–1 | (n) | 200,000 | |
| 11. COMPLETION OF URBAN RENEWAL PROJECTS | | | | | $ 212,000 |
| 12. RELOCATION PAYMENTS AND ASSISTANCE | HAP anticipates 52 relocations to be funded through existing Residential Land Reserve Fund, Neighborhood Housing Program or line item program costs | | | | |
| 13. PLANNING AND MANAGEMENT DEVELOPMENT | | | | | |
| 14. ADMINISTRATIVE | | | | (n) | $ 470,000 |
| 15. CONTINUATION OF MODEL CITIES ACTIVITIES | | | | | |
| 16. SUBTOTAL | | | | | $13,108,000 |
| 17. CONTINGENCIES AND/OR UNSPECIFIED LOCAL OPTION ACTIVITIES (n) (Not to exceed 10% of line 16) | | | | | $ 1,307,000 |
| 18. TOTAL PROGRAM ACTIVITY COSTS | | | | | $14,415,000 |

| F. RESOURCES FOR PROGRAM ACTIVITY COSTS | | |
|---|---|---|
| 1. ENTITLEMENT AMOUNT | $16,429,000 | |
| 2. LESS DEDUCTIONS       Model Cities Allocation(n) | $ 2,014,000 | |
| 3. ENTITLEMENT AVAILABLE FOR BUDGET ACTIVITIES | | $14,415,000 |
| 4. PROGRAM INCOME       Anticipated to be very small. Cannot estimate at this time. | | |
| 5. SURPLUS FROM URBAN RENEWAL PROJECT SETTLEMENT | | |
| 6. LOAN PROCEEDS | | |
| 7. UNOBLIGATED FUNDS–PRIOR PROGRAM YEAR | | |
| 8. TOTAL RESOURCES FOR PROGRAM ACTIVITY COSTS | | $15,415,000 " |

---

**4.** The distribution proposed was:

| | | |
|---|---|---|
| "–Low-interest rehab loan fund primarily for home owners | City-wide, but primarily for low- and moderate- income families | $2,175,000 |
| | CD Neighborhoods | $2,175,000 |
| –Emergency Home Repair | City-wide, but primarily for low- and moderate- income families | $ 250,000 |
| –Housing Inspection in Sound Neighborhoods | Non-CD Neighborhoods | $ 40,000 |
| Housing Inspection in Low-Interest Loan Fund Neighborhoods | CD Neighborhoods | $ 60,000 |
| –City-Wide On-Going Safety Inspection | City-Wide | $ 75,000 |
| –Manchester Title I Project No. 366: Cost of Rehab of Approximately 24 URA–Owned Units, for Sale | Census Tracts 2010 and 2103 (CD Target Neighborhoods) | $ 150,000 |
| –Homewood North Title I Project R–199: Cost of Rehab of Approximately 30 URA–Owned Units, for Sale | Census Tract 1302 (CD Target Neighborhoods) | $ 168,000 |
| –NDP Project A–15: Cost of Rehab of 80 URA–Owned Units, for Sale | Census Tracts 303, 304, 502 and 508 (CD Target Neighborhoods) | $ 567,400 " |

resources of $10,181,000 which the City also intended to devote to housing for low and moderate income persons [5] The total first year goal for housing assistance was 2536

5. The plan listed amounts from other sources as:

| Project & Activity Description (1) | Related Objective (2) | Environmental Review Status (3) | Census Tract/or Enumeration District (4) | ESTIMATED COST ($000) Current Program Year (5a) | ESTIMATED COST ($000) Subsequent Program Year (5b) | Estimated Other ($000) Sources of Funds Amount (6a) | Estimated Other ($000) Sources of Funds Source (6b) |
|---|---|---|---|---|---|---|---|
| 1. Low-interest rehab loan fund primarily, for homeowners | C 1 | Review Initiated | City-Wide ** | $2,175,000 | | $ 800,000 | Pa. Dept Community Affairs |
| | | | CD Neighborhoods | $2,175,000 | | $ 800,000 | 1974 Capital Budget |
| 4. Demolition of condemned buildings | C 2 | Review Initiated | City-Wide ** (primarily within CD Neighborhoods) | $ 400,000 | | $ 600,000 | 1975 Current Operating Budget |
| 5. Street tree planting | C 2 | Review Initiated | City-Wide ** CD Neighborhoods | $ 77,500 $ 77,500 | | $ 30,000 | Scaife Foundation |
| 19. Acquisition of land for new commercial development in Hazelwood (State renewal area) | C 13 | Review Initiated | 1505 | $ 150,000 | | $1,422,400 | Penna Dept Community Affairs |
| 22. Manchester Title I Project # R 366: Net cost of rehabilitation of approx. 24 dwelling units presently owned by the URA in Manchester Title I project area, for sale | C 4 | Exempt | 2101, 2103 | $ 150,000 | | $4,000,000 (F) $1,181,400 (S) | Manchester Continuing Conservation Program |
| 23. Homewood North Title I Project # R 199: Net cost of rehab of approx. 30 dwelling units in Homewood North, Title I project area, presently owned by URA, for sale | C 4 | Exempt | 1302 | $ 168,600 | | $1,500,000 (F) | Homewood North Continuing Conservation Program |
| 24. NDP Project A-15: Net cost of rehabilitation of approx 80 dwelling units in the Hill District NDP project area, presently owned by the URA, for sale | C 4 | Complete | 303, 304, 502, 508 | $ 567,400 | | $1,779,800 (F) $ 719,800 (NCC) | Neighborhood Development Program |
| | | | | | | [$10,181,000] | |

** To benefit primarily low and moderate income families.

units, approximately half of which would be for the elderly.[6] Prior to filing its first year application with HUD, the City submitted it to the clearinghouse agencies [7] for review and comment, and no objections were received. SPRPC noted that its Citizens Advisory Committee believed the City should put nearly all of its CDBG funds into housing, but it nonetheless found the City's proposed activity to be consistent with SPRPC's program plans and appropriate to meet the needs identified in the application. Review by HUD's Area Office revealed that the application contained all of the required certifications of compliance, including certification that it had been developed to give maximum feasible priority to activities benefiting low or moderate income families or aiding in the prevention or elimination of slums or blight, that citizen participation requirements had been met, and that it contained no ineligible activities. HUD determined that none of the stated needs and objectives were plainly inconsistent with generally available data, that the proposed activities were not plainly inconsistent with the needs and objectives, and that there was no evidence that the City failed to comply with the provisions of law, and it thereupon approved the application.

On February 4, 1976, the City submitted a grantee's performance report on its first year's activities. The Area Community Planning and Development Division (CPDD) considered this report together with additional information obtained from its monitoring activities. HUD determined that progress appeared to be substantial but suggestions were made for improvement of the City's performance relative to equal opportunity requirements. Several months later, the City was warned that the start-up difficulties which had been experienced could result in sanctions if they were not corrected.

The City's second CDBG application was received by HUD on February 2, 1976, requesting $16,919,000, of which $9,600,000 was allocated for housing and housing support activities. The HAP proposed assistance to 4,207 units, of which 1,997 were rental units and another 100 (under an emergency repair loan program) could be renter or owner occupied. This application had also been submitted to the clearinghouse agencies, and the SPRPC found the activities to be consistent with its plans and to be appropriate to identified needs. HUD raised a number of questions concerning eligibility of some proposed programs and the appropriateness of HAP goals to identified needs.[8] The City responded to HUD's criticism by revising its application and the CPDD Director then recommended approval, specifically finding that the statement of need was not plainly inconsistent with generally available facts or data, the activities

---

6. The City's total first year goal for housing assistance was 2,536 units; 894 new construction units; 1,444 existing units; and 492 rehabilitation units. 1,022 of the 2,536 units were to be for the elderly, and 1,514 units for families. In addition to the 710 units which were proposed to be provided with Community Development Block Grant funds, the City proposed to provide 1,000 units using Section 8 funds, and 676 units under other Federal programs, including the Section 236 program and public housing modernization programs. The City also proposed to provide 150 units using local funds.

7. Department of Community Affairs and the Department of Environmental Resources (through the Pennsylvania clearinghouse) and SPRPC.

8. Exhibit 11 stated HUD's objections to certain activities as ineligible, and Exhibit 11–A stated objections to the City's HAP. Paragraph 1 of 11–A noted that the City's rental vacancy rate calculation was plainly inconsistent with generally available data; Paragraph 2 stated that the housing goals of Section 8 assistance for families appeared plainly inappropriate because 55% of lower income households were non-elderly families, and the City proposed to assist only 158 family units while targeting 1632 elderly units, and because the Section 8 Existing Program was grossly inadequate; Paragraph 3 noted that the City failed to include the lower income families "expected to reside" in the City in estimating needs; Paragraph 4 noted that the City's census tract designations for Section 8 new construction did not promote housing choice for lower income persons; and Paragraph 5 noted that Block Grant funds could not be used to reduce substantially the local financial support for the Glen Hazel site.

Exhibit 11–B is the City's response. The City deleted the ineligible activities and revised its application to remove the objections to the HAP.

were not plainly inappropriate for meeting the needs, and that there was no substantial evidence that the City was not in compliance with applicable law. HUD then approved this application.

The City's Performance Report covering the second year was submitted on January 13, 1977. HUD found the City's performance compared favorably with that of other recipients of comparable size since approximately 40% of the $30,430,901 in the CDBJ Fund available after suitable deductions and offsets had been expended and that another $6,500,000 was obligated. HUD did notify the City that its performance in meeting its HAP rental assistance goals was seriously deficient [9] and that the City had failed to maintain the required equal

opportunity data, which it was directed to submit. In addition, the Area Office took two of the remedial actions open to it under 24 C.F.R. 570.910(b). [10] The City was instructed to submit quarterly goals for meeting renter needs for the coming year and to submit quarterly reports on its accomplishments.

The City's third application, requesting $15,541,000, was received by HUD on February 18, 1977, and was again accompanied by the clearing house agencies' recommendations of approval. The SPRPC determined that each of the proposed activities would benefit low or moderate income persons and were appropriate to meet the needs and objectives identified in the application. [11] However, HUD's review revealed

9. The HUD letter of February 11, 1977 stated thereto:

*Housing Assistance Plan*

Lack of progress in providing assistance to lower income renter families remains the most serious deficiency in Pittsburgh's performance. While the City has assisted 1,459 homeowners during the Second Year, local efforts resulted in assistance to fewer than fifty renter households. We recognize that the Pittsburgh Housing Authority did not revise its program policy to allow In-Place subsidy until November. Nonetheless, responsibility for achieving housing assistance goals remains with the City: failure to implement the Section 8 Existing Program can result in the exercise of sanctions proposed at 24 CFR 570.911 (enclosed). We recommend that you develop a record of Pittsburgh's substantive actions to provide assistance to low and moderate income families.

10. 24 C.F.R. § 570.910(b)(2) and (3) provide:

(b) *Actions authorized.* The following is a listing of actions that HUD may take in response to review of a recipient's performance. Such actions may be taken with regard to either an entitlement recipient or a discretionary recipient and may be taken either singly or in combination, as appropriate to the circumstances.

\* \* \* \* \* \*

(2) Request the recipient to submit progress schedules for completing approved activities.

(3) Issue a letter of warning that advises the recipient of the deficiency and puts the recipient on notice that more serious sanctions will be taken if the deficiency is not corrected or is repeated.

11. The SPRPC Approval Letter, dated February 8, 1977, stated in part:

The proposed activities contained in the City of Pittsburgh's Third Year Community Development Plan appear to be eligible for Community Development funding and are consistent with the Southwestern Pennsylvania Regional Planning Commission's plans and programs. Furthermore, we are aware of no conflict between the current activity program and other known plans or programs and believe that none of the proposed activities represents duplication of federally assisted activity.

We have examined the data presented in the Housing Assistance Plan by occupancy, tenure and appropriate totals. The data in the HAP have been compared with "Selected Population and Housing Data from 1970 Census, Fourth Count Summary Tape." With the exception of those figures representing various categories of substandard housing, the data in the HAP appears to be compatible with the housing data for the City of Pittsburgh from the 1970 census. As for the figures on substandard housing, we have been informed that the City of Pittsburgh has expanded its definition of substandard units. Pittsburgh's definition of substandard includes those units 1) where over-crowded conditions exist; 2) where some or all plumbing facilities are lacking; 3) where the resident is paying more than 25% of his income for housing; and, 4) built before 1939 and having a market value of less than $10,000. We are aware that the City of Pittsburgh contains an extensive housing stock of predominantly older homes and therefore can support the need for an expanded definition of substandard units.

In view of the fact that each of the proposed activities appear to be eligible for Community Development funding, we believe that directly or indirectly, each will benefit low and moderate income families.

that the City's HAP failed to properly address the needs of renters, other than the elderly, and HUD questioned the methodology by which housing assistance data was derived. The City responded by answering the questions and revising its housing assistance goals. The CPDD Director then recommended approval because all concerns raised by HUD's reviews had been addressed by the City or would be included in the "Matters of Advice" attached to the approval letter. The application was approved on May 4, 1977. The "Matters of Advice", Government Exhibit 19A, are attached hereto as Addendum A for a better understanding of this Opinion.

### III. STANDARD OF REVIEW

■ Plaintiffs have raised a variety of specific challenges to the approval of and performance under the City's applications for block grant programs. Before addressing these challenges, we must outline the appropriate standard for review in this Court. Our analysis must focus solely on whether the challenged agency action was arbitrary, capricious or an abuse of discretion, or was not in accordance with the law. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Court must consider whether the statutory and administrative procedure was followed, whether the Secretary considered all relevant factors, and whether in the exercise of judgment by the Secretary clear error has been shown. *Id.* Although our "inquiry into the facts [must] be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency." 401 U.S. at 416, 91 S.Ct. at 824.

■ Of course, in determining whether the agency decision was arbitrary or an abuse of discretion, one must consider the role delineated by Congress for that agency in the administrative process. Here, that role is a very limited one in application approval. The Secretary's function in this regard is to approve unless she determines the needs and objectives in the application are *plainly inconsistent* with facts and data

generally available, the proposed activities are *plainly inappropriate* to meeting these needs and objectives, and the application does not contain those components required by the Act and the activities are not eligible under the Act. Section 5304(c). The Secretary has a more active role in annual post-audit review and taking remedial action. But, again, the Court's role in reviewing these functions is merely to discern whether the Secretary has abused her discretion in the exercise of her judgment in this role.

### IV. THE MERITS

#### A. *Approval of the Applications*

■ Plaintiffs argue that the Secretary should have denied the City's applications because of a variety of violations of the HCDA and fair housing laws and that her exercise of judgment in approving them was an abuse of discretion. The only procedural defect claimed by Plaintiffs is that the City did not meet the citizen participation requirement in Section 5304(a)(6) and 24 C.F.R. 570.303(e)(4)(ii), in that citizens were only granted five minutes at the public hearings to give their views on fund allocations. (Complaint, ¶ 53(n)). However, under Section 5304(b)(4), the Secretary is authorized to accept the City's certification that adequate citizen participation was afforded. Moreover, Plaintiffs' own data and uncontradicted affidavits and exhibits reveal that the City exceeded the minimum citizen participation requirements set forth in the statute and regulations. Before submission of each application, the City mailed numerous letters to concerned individuals and groups, advertised public workshops to explain the scope of the Act, and conducted more than the minimum requirement of two hearings to receive public input. Limiting speeches to five minutes at the hearings did not deny input in light of the numerous people in attendance, and there is no showing that citizens were precluded from written comment.

■ No other procedural defects are claimed by Plaintiffs; nor do they contend that the applications, at least superficially, lack any of the necessary components and

certifications as required by the Act. What they are really contending is that the substance of these components violated the Act and the Secretary abused her discretion in approving them because they were plainly inconsistent with the general data available or plainly inappropriate with the stated needs and objectives.

Plaintiffs first allege that insufficient allocation of housing assistance funds for renters violated Sections 5304(a) and (b)(2) and 24 C.F.R. 570.303(a), (c)(3), and (e)(6), in that 60% of all needy lower-income households are renters and each of the applications in question allocated only between 12% and 16% of these funds to renters. (Complaint, ¶ 53(a), (d), and (g)). When two needy groups are identified, nowhere does the Act specify that funds must be allocated in proportion to their percentage of the housing population. Thus, the allocation was not in violation of any express allocation provision of the Act. Nor did the Secretary's approval of the application despite the "disproportionate" allocation constitute an abuse of discretion. *See Philadelphia Welfare Rights Organization v. Embry,* 438 F.Supp. 434 (E.D.Pa.1977); *NAACP v. Hills,* 412 F.Supp. 102 (N.D.Cal. 1976). As previously stated, Congress has given local officials the responsibility of allocating funds, so long as the funds are used for permissible purposes. The Secretary should deny the application only if the housing assistance plan was plainly inappropriate to meet the City's stated needs and objectives. The activities are not plainly inappropriate merely because greater focus is placed on one community development problem over another. The City's statement of needs revealed concern over an old, moderately priced housing stock with a higher rate of owner-occupancy and the need to maintain and improve this source of moderate cost housing. The Act permits local officials to make the decision to set up such allocations, and the Secretary's approval was not an abuse of her discretion. Nor did the amounts allocated to renters assistance plainly reveal a failure to give maximum feasible priority to activities which would benefit low and moderate income groups. The Secretary is authorized to accept certification by the City that maximum feasible priority was given to activities which will benefit low and moderate income families or prevent or eliminate slums and blight. The greater allocation to low and moderate income families owning homes is not plainly inconsistent with that certification or the objective of benefiting low and moderate income families.

■ Similarly, the fact that the City allocated funds for recreation facilities and public works, permissible under the Act, instead of certain other programs for housing assistance (Complaint, ¶ c and e) does not mean that the Secretary abused her discretion. Her judgment that these proposed activities were not plainly inappropriate to the needs and objectives stated was not arbitrary. Nor do such allocations plainly reveal a failure of a comprehensive strategy for meeting community needs. (Complaint, ¶ m).

■ Finally, the Plaintiffs allege that the 1975 and 1976 applications sought funds for ineligible activities, i. e., purchase of lot clean-up equipment, city-wide housing inspections, and conservation activities in "sound" areas. This is without merit since it was only on January 19, 1976 that the lot clean-up equipment was determined to be an ineligible activity (41 Fed.Reg. 2765) and other allegedly ineligible activities, although improperly designated in the application, in fact, were eligible and carried out.

### B. *The City's Performance under the Grants*

Plaintiffs contend that the City failed to carry out a program substantially as described in the applications (Complaint, ¶ 53(b)), failed to give maximum feasible priority to low and moderate income families in implementing programs (Complaint, ¶ 53(c) & (e)), showed a lack of capacity to complete the programs in a timely manner (Complaint ¶ 53(h)) and violated equal opportunity laws (Complaint, ¶ 53(f), (j), (k) & (*l*)); and that the Secretary abused her

discretion in approving applications after insubstantial performance on a prior application and in failing to impose proper sanctions.

Section 5304(d) requires the Secretary to make reviews and audits at least on an annual basis to determine whether a program was carried out substantially as described in the application, whether the program conformed to the Act and other laws, and whether the grantee has the continuing capacity to carry out the described community development program. Based on this review, the Secretary may make adjustments in the amount of current and/or forthcoming annual grants based on this review. In making the determination of continuing capacity, the Secretary is to be guided by the experience of other recipients of similar size and with similar entitlement amounts. If the recipient's performance lags substantially behind that of other recipients, the Secretary *may* require submission of additional information from the recipient to determine whether a lack of capacity is the source of substantial non-performance. The Secretary must then determine if action on the part of the recipient to eliminate the causes of substantial non-performance will satisfactorily assure the recipient has the necessary capacity to carry out its community development program in a timely manner in succeeding years. If the Secretary determines the objectives of the Act have not been met, she may require, under 24 C.F.R. §§ 570.910–913, additional information, request time tables, and issue letters of warning or suspension of activities. If, after notice and hearing, she finds that the grantee failed to substantially comply with any provision of the Act, she may terminate, reduce or limit payments until compliance is assured, or she may refer the matter to the Attorney General for civil action. Section 5311.

■ Thus, it was clearly contemplated by Congress and in the implementing regulations that a recipient will not have completely performed under a previous application when seeking funds for the next year, and such failure to perform, even if substantial, does not require the Secretary to refuse the new application. The effects of non-performance on a new application and the actions and sanctions to be imposed under a current grant are matters delegated to the sound exercise of judgment by the Secretary; and Plaintiffs have failed to identify facts which demonstrate any abuse of that discretion.

■ The uncontradicted affidavit of Bruce Crawford, Director of the Community Planning and Development Division, Pittsburgh Area Office of HUD, reveals that HUD received Pittsburgh's first performance report on February 4, 1976. (See Exhibit 6). The report was reviewed and the area office staff conducted site visits. The Area Director reported that progress on the program was substantial, goals were reasonably close to being accomplished, and the Equal Opportunity Division found no significant deviation from equal opportunity requirements in the 1975 program performance. A final report was made which concluded that the City's performance did not significantly vary from program requirements or the City's application and schedule. (See Exhibits 7 & 7A). Plaintiffs have shown no evidence that this conclusion was arbitrary or capricious.

■ In August of 1976, however, the Area Director notified the City that monitoring revealed severe start-up difficulties in the Section 8 Existing Rental Program and warned that failure to take immediate action could result in sanctions. (See Exhibits 7A & 14). The failure to take immediate sanctions was not an abuse of discretion.

■ The City's second performance report was submitted on January 13, 1977. The Area Director noted that Pittsburgh's performance compared favorably with that of other similar recipients. He concluded that the City demonstrated substantial progress, but found a deficiency in the progress in providing assistance to lower-income renter families. (See Exhibit 15A). The Economic and Market Analysis Division

of HUD's Area Office noted a lack of progress for non-elderly renters (Exhibit 16), and the Equal Opportunity Division requested additional information on equal opportunity compliance. (Exhibit 16B).

In his final recommendations, HUD's Community Planning Division Director found substantial performance. However, he requested submission of missing equal opportunity records and data, and he found that performance under the City's HAP was deficient in meeting renter needs. (Exhibit 16C). The Area Office therefore requested a schedule which set forth quarterly goals for the upcoming year for meeting renter needs and a quarterly report on its accomplishment. Plaintiffs' allegations fail to demonstrate either that these basic conclusions were arbitrary or that the actions taken were an abuse of discretion. Thus, their challenge of the Secretary's exercise of discretion in light of failure of substantial performance and lack of continuing capacity are unsupported and contrary to the uncontradicted affidavit and exhibits. Even taking all of their factual allegations as true, no abuse of discretion appears.

Likewise, Plaintiffs must fail as a matter of law in their challenge based on the allegation that the City has not given maximum feasible priority to activities benefiting low or moderate income persons in violation of Section 5304(b)(2) and 24 C.F.R. § 570.303(e)(6), in that it has failed to implement or to make progress on such activities, while conducting other programs of which the Plaintiffs disapprove. Applicants are required to certify that their programs were developed so as to give maximum feasible priority to benefiting low or moderate income persons or families, or aid in the prevention or elimination of slums or blight, or were designed to meet other urgent community needs. If the program is certified as being developed with maximum feasible priority being given to the Section 5304(b)(2) statutory objectives, the performance is then to be judged by whether the grantee has carried out a program substantially as described in its application.

It is also alleged that the City's performance was deficient because only 23% of the contractors on CDBG funded activities were "Section 3" contractors. This refers to Section 3 of the Housing and Urban Development Act of 1968, 12 U.S.C. § 1701u, which mandates that the Secretary, to the greatest extent feasible, require that opportunity for employment and training in connection with such projects be given to lower income persons residing in the project area and that contracts for work be awarded to business concerns located in or owned by persons residing in these areas. The regulations implementing Section 3 are found at 24 C.F.R. Part 135 and prescribe a series of compliance requirements. Again, however, there is no provision which would require that recipients hire a particular percentage of lower income persons or local business concerns, and the City's failure to hire more than 23% project-area contractors cannot be construed to be a violation of Section 570.303(e)(11)(vi). Finally, the allegation that one of the 53 programs benefited less than one percent minority families does not support an allegation of discriminatory use of funds, given the substantial benefit to minority families in the other programs.

We therefore conclude that there was no abuse of discretion. HUD had, over the years, made evaluations of the programs proposed by the City in its various applications. The objections to the applications were relayed to the City and procedures followed improving the applications which were thorough and in compliance with the regulations. The Court cannot substitute its judgment for that of local officials or the Secretary. Defendants' affidavits and exhibits reveal a regular administrative procedure and an adequate basis for all administrative decisions, and Plaintiffs' factual allegations, affidavit and exhibits fail to raise material questions of fact which would permit the Court to hold otherwise. Defendants' Motions for Summary Judgment will therefore be granted.

An appropriate Order will be entered.

## ORDER

AND NOW, to-wit, this 3rd day of May, 1978, after hearing and due consideration of the arguments and briefs of counsel, and for the reasons stated in the Opinion filed herewith,

IT IS ORDERED, ADJUDGED AND DECREED that the Motions of all Defendants for Summary Judgment be and the same are hereby granted.