Wayne NICKOLS, et al., Plaintiffs,

v.

Samuel R. PIERCE, Jr., et al.,
Defendants.

No. C-3-82-394.

United States District Court,
S.D. Ohio, W.D.

Dec. 13, 1982.

Wayne P. Stephan, Robert E. Hickey, Dayton, Ohio, for plaintiffs.

Gerald F. Kaminski, Asst. U.S. Atty., Dayton, Ohio, for Federal defendants.

Gerald E. Schlafman, City Sol., Fairborn, Ohio, for City defendants.

EXPANDED OPINION; FINDINGS OF FACT AND CONCLUSIONS OF LAW; JUDGMENT TO BE ENTERED FOR DEFENDANTS AND AGAINST PLAINTIFFS; CONFERENCE CALL SET

RICE, District Judge.

## I. INTRODUCTION

On July 19, 1982, Plaintiffs Wayne Nickols and the South Wright View Heights Action Committee filed this action against Samuel R. Pierce, Jr., the Secretary of the Department of Housing and Urban Development (HUD), the Regional Director of HUD, the Mayor of the City of Fairborn, Ohio and six council persons for that City, seeking to enjoin the construction of public improvements in their neighborhood for which the City had received federal grants. Plaintiffs alleged in their complaint that the City of Fairborn had violated certain provisions of the Small Cities Community Development Block Grant Program (Program) established by the Housing and Community Development Act of 1977, 42 U.S.C. § 5301, *et seq.* and regulations thereunder, to wit:

1. The City's preapplication and application for funds under the Program failed to meet the objectives set out in 24 C.F.R. § 590.420(B);

2. The preapplication and application did not meet the comprehensive grant criteria set out in 24 C.F.R. § 570.423;

3. The preapplication and application failed to meet the requirements set out in 24 C.F.R. § 570.425 by failing to provide the following:
 a. a narrative statement
 b. an appropriate funding analysis
 c. designation and description of citizen participation requirements
 d. maps as required;

4. The City failed to provide for citizen participation and failed to discuss the resources available to Plaintiffs in a timely fashion;

5. The City failed to request an adequate review in accordance with Office of Management and Budget circular A–95; and

6. The City failed to prepare the preapplication and application in accordance with law, in all respects.

Plaintiffs further alleged that HUD violated the provisions of § 5301 and the regulations thereunder by:

1. failing to comply with review requirements of available resources under 24 C.F.R. § 570.433(B)(3)(ii)(F);
2. failing to adequately review the preapplication and application for deficiencies;
3. failing to apply the selection criteria of 24 C.F.R. § 570.424, thereby abusing its discretion in approving the preapplication and application; and
4. failing to participate as required in the A–95 review process.

(Complaint, pp. 4, 5)

Plaintiffs requested the Court to enter a declaratory judgment stating that the preapplication and application were inadequate and that the failure to provide for citizen participation, the failure to discuss the assessments to be rendered against Plaintiffs and the failure to provide for appropriate review violated Federal law. Further, Plaintiffs requested the Court to find that HUD's actions were arbitrary, capricious and an abuse of discretion, in that it had exceeded its statutory authority in approving the application in question and in allocating funds for the project. Plaintiffs further contended that irreparable harm and injury would result should Defendants be allowed to continue the proposed public improvements. Plaintiffs also moved the Court to enter a temporary restraining order and a preliminary and a permanent injunction restraining and enjoining the City of Fairborn from any construction activity in the South Wright View Heights area of that City.

On September 21, 1982, Plaintiffs filed a motion for a temporary restraining order, seeking to prevent Defendants and their agents from commencing or continuing construction in South Wright View Heights, pending hearing and determination of Plaintiffs' request for a preliminary injunction. The Court granted the motion for temporary restraining order on the same day, and set the oral hearing on Plaintiffs motion for preliminary injunction for September 29, 1982.

The Court conducted an oral hearing on September 29, 1982 and October 4, 1982, at which times the parties were afforded an opportunity to present testimony and exhibits pertinent to the issues to be considered. On the first day of the hearing, Plaintiffs withdrew certain of their allegations, leaving for the Court's consideration the following claims:

1. As to the City of Fairborn, Plaintiffs claim that:

a. the preapplication and application did not meet the comprehensive grant criteria set out in 24 C.F.R. § 570.423;

b. the City failed to provide for citizen participation and failed to discuss the resources available to Plaintiffs in a timely fashion; and

c. the City failed to prepare the preapplication and application in accordance with law, in all respects.

2. Plaintiffs claim that HUD:

a. failed to adequately review the preapplication and application for deficiencies;

b. abused its discretion in approving the preapplication and application; and

c. abused its discretion in approving the allocation of funds for the City's project.

After the conclusion of Plaintiffs' case, the Fairborn Defendants and HUD moved the Court to dismiss the within action. The Court denied both motions. Defendants then presented their evidence, concluding on October 4, 1982.

The parties filed post-trial memoranda on October 12, 1982. On October 15, 1982, the Court requested additional memoranda on the issues of citizen involvement in the development of the citizen participation plan and the existence of irreparable harm. After the receipt of same, the Court notified the parties that it would conduct a further evidentiary hearing on October 27, 1982, limited to the issue of the development of the citizen participation plan.

After the hearing on October 27, 1982, at which the parties offered additional evidence on the above issue, the Court requested final memoranda from the parties, and took the matter under advisement. On November 1, 1982, the Court informed the parties, orally and by brief entry, that it would deny the Plaintiffs' motion for injunctive relief for reasons to be set forth in this Opinion.

The Court finds that under the four part test set forth by the Sixth Circuit in *Roth v. Bank of the Commonwealth,* 583 F.2d 527 (6th Cir.1978), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979), which requires the Court to assess the likelihood of plaintiffs' success on the merits, the irreparability of harm to the plaintiff, the balance of injuries as between the parties, and the impact of the ruling on the public interest, Plaintiffs' motion for injunctive relief must be denied. This ruling is based upon Plaintiffs' failure to show a likelihood of success on the merits, that irreparable harm will be suffered, absent injunctive relief, that the balance of injury is in favor of Plaintiffs (that the injury to the Plaintiffs if the injunction is not granted is greater than the injury to the Defendants if the injunction were granted and later shown to have been improvidently so granted, after trial upon the merits), and, that the granting of Plaintiffs' motion for injunctive relief would be in the public interest. Because Fed.R.Civ.P. 52(a) requires specific findings of fact and conclusions of law upon denial of interlocutory injunctions, the Court will first set forth its findings of fact, followed by a discussion of its rationale behind this opinion, and its conclusions of law.

## II. FINDINGS OF FACT

1. Plaintiffs are Wayne Nickols, a resident of an area of the City of Fairborn, Ohio, known as South Wright View Heights, and the South Wright View Heights Action Committee (Action Committee), an organization comprised of approximately 140 residents of South Wright View Heights. The Action Committee was formed because of concerns over proposed public improvements in the South Wright View Heights area of Fairborn. Wayne Nickols is the Chairman of the Action Committee. (Complaint, ¶ 6, ¶ 7).

2. Defendants are Samuel R. Pierce, Jr., Secretary of the United States Department of Housing and Urban Development, the Regional Director of HUD, the Mayor of the City of Fairborn and six council persons for that City. ·(Complaint, ¶ 8).

3. The South Wright View Heights section is an area of the City of Fairborn which contains a concentration of low and moderate income persons and deteriorated housing. (Federal Defendants' Exhibit 5, p. 2).

4. Two of the major deficiencies in public facilities within South Wright View Heights are (a) inadequate storm drainage and (b) inadequate streets (Federal Defendants' Exhibit 5, p. 3).

5. South Wright View Heights is located on, and at the base of, a hillside. The area is subject to heavy storm water runoff from the area further up the hillside and from the hilltop. South Wright View Heights does not have adequate storm drains to handle the storm runoff. Some residents have installed "jackleg" tile drainage. Other residents have built makeshift dams. These are inadequate and exacerbate rather than solve the basic drainage problem. (Federal Defendants' Exhibit 5, p. 3).

6. The Small Cities Community Development Block Grant Program (hereinafter the Program) was established by the Housing and Community Development Act of 1977, 42 U.S.C. § 5301, *et seq.* The Program was designed to assist cities and communities with a population of less than 50,000, and with a high concentration of impoverished citizens and substandard housing, to expand housing opportunities for low and moderate income families and to meet community development needs. (Federal Defendants' Exhibit 1, p. 1).

7. Among the objectives of the Program is the correction of deficiencies in public facilities. Community development activi-

ties eligible for funding under the Program to achieve this objective include the construction of streets, sewers and drainage systems. (24 C.F.R. § 570.420(b)(5), Federal Defendants' Exhibit 1, pp. 1, 5).

8. Congress appropriates funds for the Program on an annual basis. The funds are allocated to each State in two basic funding categories: (a) the metropolitan funding category and (b) the non-metropolitan funding category.

Two types of grants are available in each of the two basic funding categories: (a) comprehensive grants and (b) single purpose grants. Comprehensive grants are available for community development projects that involve two or more activities that are related to each other and that will be carried out in a coordinated manner. Single purpose grants are designed to address and resolve a specific community development need. The grant competition in each of the four competition areas is separate and distinct. (Federal Defendants' Exhibit 1, pp. 6, 9–10).

9. The maximum amounts of funds available to an applicant for a Small Cities Community Development Block Grant is one million dollars per year. Two funding options however are available to an applicant for a comprehensive grant: (a) single-time funding or (b) multi-year funding, up to three years. (Federal Defendants' Exhibit 2, p. A–2; Exhibit 1, p. 10).

10. The first step in the application process for a grant under the Program is the submission of a formal preapplication. In this document, each applicant describes, in quantifiable terms, its community needs and problems and the effect which its proposed community development program is expected to have on the community. (Federal Defendants' Exhibit 1, p. 1).

11. Each preapplication is reviewed by the appropriate Area Office of HUD. Because the demand for grants exceeds the availability of funds, a National Rating System has been devised to ensure that grants are awarded fairly and equitably. (Federal Defendants' Exhibit 1, pp. 1, 6).

12. Preapplicants receiving a satisfactory score are invited to submit a full application. HUD reviews each application in order to ascertain that all of the requirements for funding under the Community Development Block Grant Program have been met. (24 C.F.R. § 570.433).

13. Each grant applicant under the Program is required to provide its citizens with an adequate opportunity for meaningful involvement and participation in the planning, implementation and assessment of the proposed community development program. In order to achieve this goal, Federal regulations require applicants to develop and follow a written citizen participation plan. (24 C.F.R. 570.431(b)).

14. Citizens must be afforded an opportunity to participate in the development of and any changes to the citizen participation plan. (24 C.F.R. § 570.431(b)).

15. The citizen participation plan must provide for procedures which:

a) involve citizens on a community-wide level;

b) solicit and respond to views and proposals of citizens;

c) provide technical assistance to citizens where requested;

d) provide adequate notices of public hearings;

e) schedule hearings to obtain citizen views in a manner which permits broad participation;

f) conduct a minimum of two public hearings at both the preapplication and application stages;

g) advise citizens of the bases and processes to be used when submitting objections to HUD as to the approval of either the preapplication or application. (24 C.F.R. § 570.431(b)).

16. Each applicant is required to certify to HUD in the preapplication that it has complied with the citizen participation requirements set forth in 24 C.F.R. 570.431. In turn, HUD reviews each preapplication to ascertain whether the preapplication contains the mandatory citizen participation certification. (24 C.F.R. § 570.425(a)(3), 24

C.F.R. § 570.431(c)(i), Testimony of Herbert Talabere).[1]

17. In the full application, each applicant must provide HUD with a written assurance that the citizen participation requirements set forth in 24 C.F.R. § 570.431 have been met. HUD reviews each application to ascertain whether it contains the mandatory citizen participation assurance. 24 C.F.R. § 570.426(f), 24 C.F.R. § 570.-431(c)(2) (Testimony of Herbert Talabere).

18. HUD is not required by either the Housing and Urban Community Development Act of 1977 or the applicable regulations to conduct an independent investigation to ascertain whether an applicant has actually complied with the citizen participation requirements for the preapplication or application. Rather, HUD is permitted to rely upon the certification or assurance provided by the applicant. (Testimony of Herbert Talabere).

19. After the completion of a successful Community Development project under the Program, involving improvements to streets and the construction of curbs, gutters, and storm sewers, in an area of Fairborn adjacent to South Wright View Heights known as Central Wright View Heights, the City of Fairborn began preparation for the submission of a preapplication for funds to be used to improve South Wright View Heights. On October 31, 1980, Fairborn mailed a survey questionnaire to 807 residents of the area to determine the improvement most needed in the area. A total of 281 surveys were returned (approximately 35%), indicating the need for streets, storm sewers, sidewalks, curbs, and gutters.

20. The City hired Woolpert Consultants to aid them in the preparation of the preapplication and application for federal funds under the Program. Francis Leighty, a representative of Woolpert, worked with Fairborn in that capacity.

21. Leighty provided Fairborn with a preliminary citizen participation plan commonly used by Woolpert's clients. This plan met the requirements of federal regulations concerning citizen participation. The plan provided for the disbursement of information and technical assistance where necessary, the holding of public hearings to obtain citizen views, and the provision of an adequate opportunity to citizens for participation in the program application. The citizen participation plan also furnished citizens with the time and place where information concerning the program would be available. (*See*, City's Exhibit 21).

Fairborn had used such a provisional citizen participation plan in the earlier funding project conducted in Central Wright View Heights under the Program. Fairborn made some changes in the plan as to the timing of public hearings. The Fairborn City Manager approved the provisional citizen participation plan on November 14, 1980. (*See*, City's Exhibit 21).

22. The Fairborn Neighborhood Betterment Council is a citizens advisory board appointed by City Council for the purpose of acting as an intermediary between the City and citizens during federal funding projects. (Testimony of Evelyn Dobson, chairman of the Neighborhood Betterment Council, and Dorothy Howard, member of the Council).

Members are selected by City Council for unspecified terms, with maximum effort to be made for assurance of low and moderate income, minority, and affected area representation. At least two of the members are South Wright View Heights residents.[2]

23. Although federal regulations do not require the formation or utilization of a citizens advisory board, Fairborn's citizen participation plan named the Neighborhood Betterment Council as the official citizens

1. Herbert Talabere is the Program Manager for the Community Development Block Grant Program for the Ohio Area Office of the Department of Housing and Urban Development.

2. Evelyn Dobson, Chairman of the Neighborhood Betterment Council, testified that of the seven persons on the Council, two are residents of South Wright View Heights. Henry Hunter testified that two members of the Neighborhood Betterment Council are South Wright View Heights residents, and one other member is a resident of Central Wright View Heights.

group for fulfilling citizen participation requirements. Under the plan, the Neighborhood Betterment Council and the City were to work together in order to accomplish both the general policy of the plan, and to meet federal requirements in order to assure an award of funds from HUD.

24. On the afternoon of November 24, 1980, the Neighborhood Betterment Council was presented the provisional citizen participation plan by Henry Hunter, a city planner for Fairborn. The Neighborhood Betterment Council was given an opportunity to make suggestions and modifications in the plan. After some discussion regarding the possibility of increasing the proportion of South Wright View Heights residents on the Council, the proposed plan was accepted without change.

The Court thus finds that the members of the Neighborhood Betterment Council, acting in their capacity as a citizens advisory board representing all of the citizens of South Wright View Heights, were afforded an opportunity to participate in the development of the citizen participation plan.

25. Fairborn had scheduled the first of two required public hearings during the preapplication stage for the evening of November 24, 1980. A legal advertisement was placed in the Fairborn Daily Herald on November 21, 1980.[3] This legal advertisement provided adequate notice of the public hearing. Additionally, a flyer was distributed door to door in South Wright View Heights on November 15, 1980.[4] Although

the flyer was addressed to Central Wright View Heights residents, a majority of the 22 residents who attended the meeting were residents of South Wright View Heights.[5]

26. Francis Leighty, Henry Hunter, and several members of the Neighborhood Betterment Council attended the first public hearing on November 24, 1980. The program preapplication, costs of improvements, assessment procedures, and the required citizen participation were explained to the 22 citizens who attended the meeting.

Although the citizens in attendance were offered an opportunity to participate in the development of the citizen participation plan, no objections were made with regard to it. The citizens were also encouraged to express their opinions and to become involved in the planning and implementation of the public improvement program for South Wright View Heights. (*See,* City's Exhibit 7).

27. On December 5, 1980, the Neighborhood Betterment Council approved the City staff recommendations for the preapplication except as to the use of swales for storm drainage and recommended that the proposed public improvements be accomplished in the same manner as those in the 1980 grant for Central Wright View Heights. (*See,* City's Exhibit 8).

28. On December 8, 1980, the second public hearing on the preapplication was held before the Fairborn City Council, at a regular council work session, after legal

---

3. *See,* Appendix A–1.

4. *See,* Appendix A–2.

5. The Court notes that, although the flyer was addressed to *Central* Wright View residents, instead of South Wright View residents, it was distributed in South Wright View Heights. From the names and addresses taken at the meeting, the Court was able to determine that at least 14 of the 22 attendees were residents of South Wright View Heights. (*See,* City's Exhibit 5 and Appendix A–2). Thus, the Court concludes, even though the flyer was addressed to Central Wright View residents, that it was not misleading, and that it conveyed adequate notice of the public hearing.

The three residents of South Wright View Heights (Wayne Nickols, Jack Nickols, and Arville Thomas) who testified at the hearing were not in attendance, because they claim that they were not made aware of it. *Assuming arguendo,* that some residents did not receive flyers (contrary to the evidence presented), adequate notice of the meeting (providing all pertinent information) was also placed in the Fairborn Daily Herald several days prior to the meeting. (*See,* Appendix A–1) Even if residents were not alerted by flyer that a meeting was scheduled, the notice in the newspaper provided an additional notice of that fact.

The City obviously cannot compel citizens to read legal advertisements. It can only give citizens an opportunity to inform themselves, and hope that interested citizens will do so and will attend the meetings, notice of which is given in the legal advertisement.

advertisement of the hearing was published in the Fairborn Daily Herald on December 2, 1980.[6] Members of the Neighborhood Betterment Council were present and participated in the discussion concerning the preapplication, grant program, and drainage problems of the South Wright View Heights area. There were no citizens in attendance other than council and Neighborhood Betterment Council members. Thereafter, by Resolution No. 155–80, on December 15, 1980, the City Council authorized the submission of a preapplication for Community Development Block Grant Funds. (*See,* City's Exhibit 11).

29. Woolpert Consultants prepared the preapplication for the City of Fairborn. As part of the preapplication, Fairborn certified to HUD that it had met the citizen participation requirements set forth in 24 C.F.R. § 570.431. The City also noted that assessments would be used to pay for part of the proposed public improvements.[7] The preapplication was submitted to HUD on January 11, 1980, requesting a three year, three million dollar metropolitan comprehensive grant. Public notice of the submission of the preapplication to HUD was published in the Fairborn Daily Herald on January 29, 1981, stating that a copy thereof was available at the City Administration Building and that citizens could submit objections to its approval directly to HUD.[8] On April 13, 1981, HUD approved the preapplication, and invited Fairborn to submit a full application for funds. (*See,* Federal Defendants' Exhibit 5 at p. 12 and Exhibit 9).

30. The first public hearing on the full application was held on April 21, 1981, at the Neighborhood Service Center after notice was given thereof by a door to door flyer[9] distributed to all the residents of the area and mailed to non-resident property owners and by legal advertisement published in the Fairborn Daily Herald on April 16 and 23, 1981.[10] At the hearing, attended by more than 50 citizens, the full application, improvement plan, citizen participation plan, improvement costs, and the possibility of assessment waivers for qualifying low income families were discussed with the citizens in attendance who voiced their

---

6. *See,* Appendix A–3.

7. The Court notes that as a part of their Answer in this case, the City Defendants "admitted" that there was no indication in the preapplication or application that citizens had been notified of the possibility of assessment of individual home owners. (Doc. # 2, ¶ 3). The Court's review of the preapplication and application, however, revealed that the matter of proposed assessments was, in fact, raised in both documents, as discussed above, and in Finding of Fact # 33. (*See,* Federal Defendants Exhibit 5, p. 12, and Exhibit 12, p. 1 of Comprehensive Strategy Summary). Further, the evidence presented at the hearings clearly indicated that the subject of assessments was raised at several of the public hearings held by Fairborn prior to the submission of the preapplication and application to HUD.

The Court concludes that because Fairborn was not required to indicate to HUD that citizens had been notified of the possibility of assessments, the fact that they "admitted" that they did not do so is irrelevant to the considerations discussed herein. This is especially true in light of the Court's finding that citizens *were* notified of the possibility of assessments, and that HUD was made aware of the proposed assessments.

8. *See,* Appendix A–4.

9. The flyer distributed by Fairborn contained a map of the affected area, and explained that Fairborn had received "preliminary approval for a 3-year grant" from HUD. The notice was in all other respects, the same as the flyer distributed for the first public hearing, before submission of the preapplication, including the reference to Central Wright View Residents. The flyer was distributed, however, to South Wright View Heights residents, and citizen turnout was higher than before. (*See,* City's Exhibits 13 and 15).

For the reasons set forth in note 5, the Court concludes that the flyer was not misleading and that citizens were given adequate notice of the public hearing, both by flyer and legal advertisement.

The three South Wright View Heights residents who testified at the hearing claim that they did not receive this flyer, either. However, even if they did not receive the flyer, adequate notice of the public hearing was placed in the Fairborn Daily Herald. The Court again concludes that the City cannot compel citizens to read the notices, nor to attend the public hearings.

10. *See,* Appendix A–5.

views and objections. (*See,* City's Exhibit 16).

31. On May 4, 1981, the second public hearing was held on the full application before City Council at the City Administration Building after notice was given thereof to the public by legal advertisement in the Fairborn Daily Herald on April 16 and 23, 1981.[11] Again the full application plan, improvement costs, citizen participation and funding were discussed with the citizens who had the opportunity to speak concerning their objections and views concerning the improvement project and Grant.[12] The Neighborhood Betterment Council presented its recommendations to the City Council concerning the full application. After full discussion, Fairborn City Council by Resolution No. 67–81, dated May 4, 1981, authorized the submission of the full application to HUD. (*See,* City's Exhibits 18 and 19).

32. Citizens were given adequate notice of each of the public hearings held by the City. At each meeting, citizens were afforded an opportunity to participate in the implementation of the citizen participation plan, and in the development of the Community Development Program for South Wright View Heights.

33. The City of Fairborn submitted its full application to HUD on May 11, 1981. As a part of its application, the City noted that affected property owners, other than those of low and moderate income, would be assessed for a portion of the public improvements that were planned under the City's community development program.[13] The City also provided HUD with its assurance that the requirements of 24 C.F.R. § 570.431 with regard to citizen participation had been met. On May 29, 1981, a public notice of the submission of the full application was published in the Fairborn Daily Herald stating that copies were available at the City Administration Building and that objections could be submitted to HUD.[14] (*See,* Federal Defendants' Exhibit 12).

34. On July 15, 1981, HUD awarded the City of Fairborn a one million dollar grant under the Program for fiscal year 1981. Additionally, HUD committed to the City one million dollars for fiscal year 1982 and one million dollars for fiscal year 1983, under the Program, subject to fund appropriations by Congress. (*See,* Federal Defendants' Exhibit 18).

35. On May 17, 1982, the City of Fairborn Council passed Resolutions Nos. 43–82 and 44–82 which declared the necessity of constructing the public improvements that are the subject of this lawsuit. Additionally, on June 28, 1982, the City of Fairborn decided to proceed with the public improvements pursuant to assessment procedures set forth in Chapter 727 of the Ohio Revised Code.[15] (*See,* City's Exhibits 28, 29, and 30).

11. The notice of the second public hearing prior to submission of the full application was published on April 16 and April 23, 1981, in conjunction with the publication of notice for the first full application hearing. The text of the notice is the same as that for the first meeting (set forth in Appendix A–5) except for the change in the hearing from "First" to "Second". (*See* City's Exhibit # 14).

12. Although the record does not indicate that any evidence was presented concerning the discussion of assessments at the May 4, 1981 meeting, the City stated in its Brief that "assessment costs ... were discussed with citizens" at this meeting. (Doc. # 8, p. 3).

13. *See,* Federal Defendants' Exhibit 12, p. 1 of Comprehensive Strategy Summary.

14. *See,* Appendix A–6.

15. Defendants have pointed out that, while a few of the affected property owners filed objections to the estimated assessments with the City's Equalization Board, pursuant to Ohio Rev.Code § 727.15, the Equalization Board recommended that no changes be made in the amount of the estimated assessments. Further, none of the adversely affected property owners appealed the decisions of the Equalization Board.

The Court, however, does not attach any significance to this fact, because Plaintiffs seek to invalidate the entire procedure which led to the levying of assessments for the proposed public improvements. Pursuant to Ohio Rev.Code § 727.17, the Equalization Board has only the authority to "equalize such estimated assessments as it thinks proper to conform to the standards prescribed in the resolution"; the Board does not have authority to invalidate assessments. In other words, the Court be-

36. Plaintiffs learned of the proposed assessments for public improvements sometime after the submission of the full application to HUD. Sometime in the late fall of 1981, after the full application had been approved by HUD, the South Wright View Heights Action Committee was formed with the purpose of objecting to the proposed public improvements. Members of the Committee began attending meetings and work sessions of the Neighborhood Betterment Council and the Fairborn City Council in an effort to stop the proposed project. The Committee retained an attorney, who met with the City Manager on February 5, 1982, to discuss the Committee's objections, and to request that further action be delayed until a second survey of area residents could be conducted. The City Manager denied the Committee's requests, by letter dated February 16, 1982, and advised the committee of its right to present its grievances to City Council. The Action Committee requested a hearing before council pursuant to Article VII of the citizen's participation plan. City Council heard the appeal of the South Wright View Heights Action Committee on March 8, 1982, and denied the same by letter dated March 15, 1982. The Action Committee also filed an objection with HUD, which was referred to the City by HUD. The City responded to the objection by letter dated March 5, 1982, to Plaintiff and Chairman of the Action Committee, Wayne Nickols.[16] (City's Exhibits 22–27).

37. The City of Fairborn retained KZF Engineering to design the proposed drainage system and street improvements for South Wright View Heights. The proposed system is designed to control the water runoff of a 25 year storm,[17] and is intended to alleviate the drainage problems presently existing in South Wright View Heights.

38. Plaintiffs did not introduce any evidence other than their own testimony to support a finding that the residents of South Wright View Heights will suffer any physical damage to their property as a result of the construction of the proposed drainage system or street improvements. Henry Fedders, the engineer who designed the drainage system, testified that the system will correct the drainage problems in South Wright View Heights. The Court finds that Fedder's expert testimony outweighed the lay testimony of Plaintiffs.

Plaintiffs have not shown that they will be physically injured by the construction of the proposed drainage system or street improvements.[18]

39. On July 13, 1982, the City of Fairborn entered into a contract with Sycamore Builders, Inc. for the construction of Section 1 of the project for a cost of $384,-144.40 and on September 7, 1982, entered into a contract with said company for Section 2 of the project at a cost of $634,228.40. Thereafter, the contractor commenced work by removing trees, fences and mailboxes which were located in the City's right-of-way and continued until stopped by the temporary restraining order issued herein on September 21, 1982. The entire project is to be constructed within the rights-of-way and easements of the City with the exception of the property of Arville Thomas. The City has taken appropriate legal action to commence proceedings to appropriate a storm sewer line easement across

lieves that the fact that objections (seeking to have the amount of assessment changed) were or were not filed with the Equalization Board, is irrelevant to the Court's consideration of Plaintiffs' claims (which seek to invalidate the entire Program).

16. Plaintiffs claim that the City has been unresponsive to their concerns. The evidence presented indicates, however, that the contrary is true. Although at the May 4, 1981 full application hearing the Neighborhood Betterment Council recommended that sidewalk construction be mandatory, (see, City's Exhibit 18, p. 4),

Plaintiff Jack Nickols testified that sidewalks were removed from the proposed construction plan *in response to the objections of citizens.* (*See,* City's Exhibit 18, p. 4).

17. Henry Fedders, of KZF Engineering testified that a 25-year storm is a storm of such force, that it occurs statistically only once in 25 years.

18. Moreover, Plaintiffs testified that should they actually suffer property damage, their losses would be monetarily quantifiable. *See,* note 41.

the Thomas property. (*See,* City's Exhibit 31).

40. Under the terms of the above contracts, Sycamore Builders, Inc. has the right to terminate the contracts if work is stopped for a period of 30 days by order of any court, and to recover from the City of Fairborn payment for all work executed and any reasonable profits and damages. Should Sycamore Builders, Inc. terminate the contracts, the City would be required to renegotiate the contracts at a potentially higher contract price. (*See,* City's Exhibit 31).

41. The residents of South Wright View Heights may suffer higher assessment costs if the City is forced to renegotiate construction contracts for the proposed public improvements. Moreover, the residents of South Wright View Heights will continue to suffer serious drainage problems until the proposed sewers and gutters are constructed. It is in the public interest, therefore, to deny injunctive relief in this case.

42. The balance of injuries between the parties, should an injunction issue, is in favor of Defendants, because Plaintiffs have not proven that they will actually suffer any injury, should the injunction not be granted, and, conversely, because of the risk to the City of Fairborn that it will be forced to renegotiate the construction contracts at a higher contract price, should the Plaintiffs' request for injunctive relief be granted and should that injunction later be found, after trial upon the merits, to have been improperly granted.

## III. DISCUSSION

In *Roth v. Bank of the Commonwealth,* 583 F.2d 527 (6 Cir.1978), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979), the Sixth Circuit defined the appropriate standard to be employed in evaluating motions for preliminary injunctions as a four part balancing test. "In addition to assessing the likelihood of success on the merits, the court must·consider the irreparability of any harm to the plaintiff, the

balance of injury as between the parties, and the impact of the ruling on the public interest." *Id.* at 537–38, quoting with approval from *Metropolitan Detroit Plumbing and Mechanical Contractors Association v. HEW,* 418 F.Supp. 585, 586 (E.D.Mich.1976).

Balancing the four factors required by *Roth,* the Court finds that injunctive relief is not appropriate under the circumstances of this case. The Court first notes that Plaintiffs have not shown a likelihood of success on the merits. Further, Plaintiffs have not shown that they will suffer irreparable harm absent injunctive relief, since a remedy exists under Ohio law which would fully compensate Plaintiffs for any injury they might suffer as a result of the construction of the proposed public improvements. The balance of injuries between the parties is in favor of Defendants, because Plaintiffs have not shown that they will suffer physical damage to their property, and because of the risk of increased costs to the city, should it be forced to renegotiate the construction contracts. Finally, the Court concludes that the denial of injunctive relief in this case will impact favorably on the public, by reducing the risk of increased assessment costs for public improvements which could result from increased contract costs, and by allowing the City to proceed with construction of the proposed public improvements, which are designed to alleviate the serious drainage problems in South Wright View Heights.

Preliminarily, the Court finds that the essence of Plaintiffs' complaint is that the City of Fairborn did not afford them an opportunity to participate in the development or further implementation of the citizen participation plan as required by 24 C.F.R. § 570.431.[19] Plaintiffs believe that Fairborn failed to meet the requirements of 24 C.F.R. § 570.431 by failing to give adequate notice of public hearings, failing to solicit and respond to citizen views, and by failing to provide for a process of citizen involvement on a community wide level. Plaintiffs' contention is that because they were not aware of the project while it was

---

**19.** See Appendix B for the text of 24 C.F.R. § 570.431(a) and (b).

being planned, they could not object to the design of the proposed drainage system, or more importantly, to the assessments contemplated as a part of the project.

■ The Court finds that the provisions of the citizen participation plan itself meet the requirements of 24 C.F.R. § 570.431.[20] As a matter of general policy, the plan provided for the disbursement of information and technical assistance where necessary, the holding of public hearings to obtain citizen views, and the provision of an adequate opportunity to citizens for participation in the program application. The plan furnished citizens with the time and place where information concerning the program would be available.

The plan named the Neighborhood Betterment Council as the official citizens group for fulfilling citizen participation requirements. Members of the Council are selected by the City Council for an unspecified term, with maximum effort to be made for assurance of low and moderate income, minority, and affected area representation. At least two of the members of the Council are residents of South Wright View Heights.[21] The Neighborhood Betterment Council and the City were to work together under the plan in order to accomplish both the general policy of the plan as set forth above, and to meet federal requirements in order to assure an award of funds from HUD.

There is no question that the citizen participation plan itself met, and in some instances exceeded the requirements of the regulation. Specifically, Fairborn adopted the Neighborhood Betterment Council as an advisory board where no such requirement existed in the regulation. In fact, HUD specifically rejected such an idea when it was suggested by commentators in 1980.[22] In response to such a suggestion, HUD said that it "encourages the creation and use of such boards where citizens and communities

find them the most effective method of ensuring meaningful CP [citizen participation]" but that it "chose[ ] not to mandate advisory boards for all Small Cities grantees." 45 Fed.Reg. 55976 (1980).

Plaintiffs have not shown any deficiencies on the face of the citizen participation plan, and the Court is satisfied that it meets the requirements of 24 C.F.R. § 570.431. Plaintiffs, however, have argued that the manner in which Fairborn implemented the citizen participation plan was inadequate to meet the requirements of the regulation, in that they were not actually afforded an opportunity for meaningful involvement in the planning of the program for South Wright View Heights. Plaintiffs have further contended during the course of this litigation that they were denied the opportunity to participate in the *development* of the citizen participation plan itself, in violation of the requirements of the regulation. In view of the testimony offered by the parties at both the hearing on September 29, 1982, and for the reasons stated below, the Court concludes that the citizens of South Wright View Heights were offered ample opportunity to participate in both the development of the citizen participation plan itself, and in its implementation, i.e., in the process of preparing the preapplication, application, and the Community Development Program for South Wright View Heights.

■ Considering first the issue of citizen involvement in the development of the citizen participation plan, the Court makes the following preliminary observation: Prior to 1980, there was no requirement in 24 C.F.R. § 570.431 for citizen involvement in the development of the plan. However, in an effort to clarify "existing policies and procedures", HUD published a proposed rule in the Federal Register on April 8, 1980 for public comment. 45 Fed.Reg. 55968 (1980). A single set of requirements for

---

**20.** The Citizen Participation Plan adopted by the City of Fairborn on November 14, 1980 is the City's Exhibit 21.

**21.** *See,* note 2.

**22.** For a complete discussion of the changes made in the federal regulations concerning the Small Cities Program, see 45 Fed.Reg. 55968–78 (1980).

citizen participation (instead of a separate set of regulations for Comprehensive and Single Purpose Grants, respectively) was proposed in the April 8, 1980 rule. Approximately 30 written comments were sent to HUD on various aspects of the new citizen participation requirements. HUD responded to most of the comments by adding language "under [24 C.F.R. § 570.431, subsection] (a) to emphasize that the objective of these requirements is to assure meaningful CP [citizen participation] involvement on a continuing basis through all stages of a Small Cities Program". *Id.* at 55976. HUD received two comments, however, pointing out that "there was no requirement for citizen involvement in the *development* of the written plan." *Id.* at 55976 (emphasis added). HUD responded to these comments by adding such a requirement in the first paragraph of 24 C.F.R. § 570.431, subsection (b).

The Court's research produced neither a definition of "development" in the regulations, nor any case law construing 24 C.F.R. § 570.431(b). Because "[a] fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning", *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979), the Court concludes that it must be guided by the "ordinary" meaning of the word "development" in interpreting what is required by the regulation, in the absence of any other definition to the contrary.

"Development" is, of course, "the act or process of developing". *The Random House College Dictionary,* 363 (Revised Edition, 1980). "Develop" is defined as "to cause to grow or expand", "to elaborate or expand in detail" or "to bring into being or activity; generate; evolve". *Id.* The Court concludes that the "ordinary" meaning of the phrase "involved in the development", in the context of 24 C.F.R. § 570.-431, means that citizens must have an opportunity to offer suggestions and comments which would expand or elaborate on the plan proposed by a community to meet its citizen participation needs.

The Court, however, does not believe that a community is required under the regulation to disregard an existing citizen participation plan and to start from "scratch" each time it seeks federal funding under the Program. Neither does the Court believe that a community must do more than invite citizens to attend any hearings conducted for the purpose of gathering citizen input with respect to the citizen participation needs of the community. Rather, the Court believes that, if citizens are invited to attend a public hearing where they are offered an opportunity to modify an existing citizen participation plan to meet their individual needs, such as was done in this case, the requirements of citizen involvement in the development of the citizen participation plan will have been met. Accordingly, the standard used to evaluate the evidence presented in this case is whether citizens were invited to attend any hearings at which the citizen participation plan was presented, and whether at such hearing, citizens were offered an opportunity to modify the plan, in order to meet *their* citizen participation needs.

The evidence presented in this case indicates that the citizens were offered more than one opportunity to modify the provisional citizen participation plan adopted by Fairborn. On the afternoon of November 24, 1980, Henry Hunter, a city planner for Fairborn, attended a meeting of the Neighborhood Betterment Council at a church near the target area. There, Hunter read the provisional citizen participation plan to the members of the Council, and asked for their suggestions and comments. There was some discussion concerning the possibility of increasing the number of members on the Council, but it was decided that no changes would be made in the membership because the local residents had shown no interest in the Council and because it was felt that a smaller group would be easier to work with. After resolution of the membership issue, the Council members concluded that they were satisfied with the citizen participation plan and approved it without modification.

In the evening of the same day, the first public hearing during the preapplication period was held at the Fairborn Neighborhood Service Center. The City had advertised the hearing in the Fairborn Daily Herald several days before the meeting took place, and had distributed flyers door to door in South Wright View Heights more than a week before.[23] Approximately 22 citizens attended the meeting,[24] as well as Henry Hunter, Francis Leighty from Woolpert Consultants and several members of the Neighborhood Betterment Council. Hunter presented the provisional citizen participation plan to the citizens in attendance and asked for their comments and questions. The only question raised by a citizen was an inquiry as to why a new citizen participation plan was being adopted when a plan had previously been adopted for use in an earlier funding project conducted in Central Wright View Heights. The citizens were given an opportunity to modify the plan, but no changes were suggested. Based on the lack of citizen input, the City made no changes in the plan, and it was thereafter utilized as an operational plan, and became the basis for citizen participation in the Grant program.

The Court concludes that the City invited citizens to attend a public hearing, both by flyer and legal advertisement, where the citizen participation plan was explained and citizen comments and suggestions were sought, as to whether that citizen participation plan should be modified in any way. Further, the Court finds that the City explained the plan to a citizens advisory board whose purpose was to act as an intermediary between the City and its citizens during federal funding projects. None of the members of the Council or the attendees at the first public hearing offered any suggestions for changes in the plan; to the contrary, all of the citizens involved appeared satisfied with the plan as it existed. Finally, the Court finds that the City did all that it was required to do to encourage citizen input, and that citizens had ample opportunity to be involved in the development of the citizen participation plan.

Turning to the issue of the implementation of the citizen participation plan, the Court finds from the evidence presented that citizens were afforded an adequate opportunity for meaningful involvement and for participation in the planning of the program for South Wright View Heights.

During the preapplication stage of the funding process, Fairborn held two public meetings as required by the regulation. Legal advertisements were placed in the Fairborn Daily Herald several days prior to each hearing, and as discussed above, flyers were distributed door to door describing the City's plans and the activities contemplated.

At the first hearing, the Grant program and citizen participation requirements were discussed.[25] At the second hearing, held on December 8, 1980 at a City Council work session, the Grant program and preapplication were discussed.[26] Members of the Neighborhood Betterment Council who were present participated in the discussion, especially expressing concern about a solu-

---

**23.** In scrutinizing the flyer distributed door to door on November 15, 1980, the Court noted that it was addressed to *Central* Wright View residents, instead of South Wright View residents. However, the flyer was distributed in South Wright View Heights, and in view of the fact that a majority of the attendees at the November 24, 1980 meeting were South Wright View Heights residents, the Court is of the opinion that the flyer was not misleading, and that it adequately conveyed notice of the public hearing.

For the text of the legal advertisement and the flyer, see Appendix A–1 and A–2.

**24.** The three South Wright View Heights residents who testified at the hearing did not at-

tend this meeting, because they claim they did not receive notice of it. The evidence presented indicates that the flyers were, in fact, distributed door to door in South Wright View Heights. However, *assuming arguendo,* that some residents did not receive flyers, notice of the meeting was placed in the Fairborn Daily Herald several days prior to the meeting. The Court does not believe that the City could have done any more to encourage citizens to attend the meeting.

**25.** *See,* City's Exhibit 7.

**26.** *See,* City's Exhibit 10.

tion for drainage problems in South Wright View Heights.[27] At both hearings the subject of assessments for the public improvements was raised and discussed.

After the City authorized its submission to HUD,[28] Woolpert Consultants prepared the preapplication. It was submitted to HUD on January 11, 1981. Public notice of the submission was published in the Fairborn Daily Herald on January 29, 1981, explaining where a copy of the preapplication would be available and the procedure to be used for filing objections.[29]

On April 13, 1981, HUD approved Fairborn's preapplication and invited the City to submit a full application. The procedures utilized by Fairborn during the application period were essentially the same as those used during the preapplication period. Legal advertisements were placed in the Fairborn Daily Herald on April 16 and 23, 1981 for both the first and second public hearings on the full application.[30] The notices indicated that one of the purposes of the hearings was to receive citizen views and to explain some of the planned activities. In addition, a flyer, notifying citizens of the scheduled hearing, was distributed door to door in South Wright View Heights and mailed to non-resident property owners.[31]

The first full application hearing held on April 21, 1981, was attended by more than 50 citizens.[32] Many of the citizens presented their views and objections, especially as to the issue of proposed sidewalks.[33] The full application, improvement costs and possibility of assessment waivers for qualifying low income families were also discussed. The second public hearing, held on May 4,

1981, at a City Council work session, was attended by members of the Neighborhood Betterment Council and citizens. Several citizens commented on the plan in response to Mayor Torch's request for public input.[34] The Neighborhood Betterment Council gave City Council its recommendation to submit the full application.[35]

The City authorized the submission of the full application by resolution at the second public hearing on May 4, 1981, after which the application was prepared, and submitted to HUD on May 11, 1981. On May 29, 1981, a public notice of the submission was published in the Fairborn Daily Herald, again explaining where a copy of the application would be available and the procedure to be used for filing objections.[36] HUD approved the application and awarded Fairborn a one million dollar grant for 1981 and committed one million dollars for 1982 and 1983 to the City, on June 15, 1981.

Plaintiffs claim that the above procedures did not provide them with an adequate opportunity for meaningful involvement and for participation in the planning and implementation of the program in violation of 24 C.F.R. § 570.431. In support of this contention, they cite three cases dealing with citizen participation requirements under the Community Development Block Grant program: *Broaden v. Harris*, 451 F.Supp. 1215 (W.D.Pa.1978), *Ulster County Community Action Committee, Inc. v. Koenig*, 402 F.Supp. 986 (S.D.N.Y.1975), and *NAACP—Santa Rose—Sonoma County Branch v. Hills*, 412 F.Supp. 102 (N.D.Cal. 1976). In each of those cases, however, the City's citizen participation procedures were

---

**27.** *Id.* at 3.

**28.** *See,* City's Exhibit 11.

**29.** *See,* Appendix A–4 for the text of the Notice of Submission.

**30.** *See,* Appendix A–5.

**31.** *See,* note 9.

**32.** *See,* City's Exhibit 15.

**33.** Parenthetically, the Court notes that the City later removed sidewalks from the proposed construction plan because of citizen ob-

jections. The Court believes that this fact further supports the conclusion that the City afforded citizens ample opportunity to participate in the Community Development Program for South Wright View Heights. *See,* footnote 16.

**34.** *See,* footnote 12.

**35.** *See,* City's Exhibit 18.

**36.** *See,* Appendix A–6.

upheld, and the Court finds no substantial distinction between the facts set forth in those cases and in the present one, because in each of the cited cases, the opportunity for citizen input was quite similar to that in Fairborn. The Court concludes that the above-cited cases in fact support a finding that the City of Fairborn in this case did not violate the citizen participation requirements of the regulation.

Plaintiffs have stated that they did not become aware of the Grant Program until after the submission of the application. However, the evidence presented at the hearings before this Court shows that the City made a substantial effort to publicize the Program, that adequate notice of the hearings was given, and that many of the local citizens did take notice of the City's actions. Further, those citizens who attended the hearings were offered ample opportunity to air their views. In sum, the Court finds that on the evidence presented, the City of Fairborn did not violate the requirements for citizen participation set forth in 24 C.F.R. § 570.431.

Plaintiffs also seek relief under the theory that HUD failed to adequately review the City's preapplication and application, causing approval of deficient documents. In response to this claim, the Court first notes that having found no violation of the regulation with respect to the development of the citizen participation plan or the City's actions thereunder, this claim has no merit. Second, *assuming arguendo* that a violation of the regulation did take place, the Court finds that HUD would not be liable as a result of such a violation.

Applicants for Community Development Block Grant funds are required by 24 C.F.R. § 570.431(c) to submit, with both the preapplication and application, a certificate of compliance with the citizen participation requirements. HUD is not required to conduct an independent investigation of each community's procedures. Rather, HUD is only required to review each preapplication and application to make certain that each contains the mandatory certifications.[37]

The evidence presented shows that Fairborn provided HUD with certificates of compliance in both its preapplication and application.[38] Further, HUD reviewed the documents submitted, and ascertained that the certificates were indeed included. The Court finds that in this case, HUD was required to do no more under the applicable regulations.

■ Additionally, the Court is guided by the Supreme Court's decision in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), wherein the Court stated that, in a case of this sort, the standard of review for agency action is whether the action was arbitrary, capricious or an abuse of discretion. "Of course, in determining whether the agency decision was arbitrary or an abuse of discretion, one must consider the role delineated by Congress for that agency in the administrative process." *Broaden v. Harris, supra,* at 1225. Because Congress has required only that HUD ascertain that the compliance certificates were submitted, the Court finds that HUD did not abuse its discretion nor act arbitrarily in approving the preapplication or application after finding that Fairborn had submitted the certificates. Thus, the Court concludes that HUD would not be liable to Plaintiffs even if this Court were to have concluded that a violation of the citizen participation requirements had taken place.

In light of the above findings that Fairborn did not violate 24 C.F.R. § 570.431, and that HUD's actions were not contrary to law or an abuse of discretion, the Court has concluded that Plaintiffs have not shown a likelihood of success on the merits of their claims.

Plaintiffs have also contended that they will suffer irreparable harm in the absence of injunctive relief in that they do not have an adequate remedy at law. The Court believes that the contrary is true.

**37.** *See,* 24 C.F.R. § 570.425(a), 570.431(c)(1), 570.426(f), and 570.431(c)(2).

**38.** *See,* Federal Defendants' Exhibit 5 and 12.

Plaintiffs claim that they have suffered irreparable injury from the alleged denial of the right to participate in the development and implementation of the citizen participation plan, and the planning of the Community Development Program for South Wright View Heights. This claim logically has no merit, however, in view of the Court's finding that Plaintiffs were, in fact, offered ample opportunity to participate in the development and implementation of the citizen participation plan and the planning of the improvements for South Wright View Heights. However, Plaintiffs have also claimed that it is their belief that the design of the proposed public improvements (most particularly the storm drainage system) will exacerbate rather than alleviate the drainage problems in South Wright View Heights.[39] They contend that absent injunctive relief, they will be without an adequate remedy at law to compensate them for any damages they might suffer as a result of the proposed construction.

Defendants have offered a number of theories under which they believe Plaintiffs could successfully seek redress for their injuries, including the theory of constructive taking under the Ohio Constitution.[40] The Court agrees that Ohio law provides a remedy for the constructive taking of property in a situation such as this. The Ohio Supreme Court in *Masley v. City of Lorain,* 48 Ohio St.2d 334, 340, 358 N.E.2d 596, 600 (1976) stated that "where a municipality constructs a public improvement, such as a storm sewer system, and thereby effectively takes private property for its own use by casting surface waters upon the property, it must pay compensation for the property taken under Section 19 of the Ohio Bill of Rights. [Art. 1, § 19 of the Ohio Constitution]." Further, Article 1, § 19 of the Ohio

Constitution provides for the payment of compensation "in money", the amount of which is to be "assessed by a jury." Thus, the Court finds that, should Plaintiffs actually suffer injury from increased drainage problems on their property, a cause of action exists for compensation under the Ohio Constitution, and that any such injury would be monetarily quantifiable by a jury.[41] Accordingly, the Court concludes that Plaintiffs have not made a showing of irreparable harm necessary to sustain a motion for preliminary injunctive relief.

■ In summary, the Court finds that Plaintiffs have failed to bear the burden of showing that they have a likelihood of success on the merits, or that they will suffer irreparable harm absent an injunction, as required under the *Roth* balancing test. With respect to the balance of injury as between the parties, Defendants have shown that, should an injunction issue, and should it later be shown, at trial upon the merits, that a permanent injunction should not be granted, there is a substantial risk that they will be required to renegotiate the construction contracts at a higher cost. Balanced against Defendants' potential injury, however, is the fact that, from the evidence presented, there is very little risk of injury to Plaintiffs' property, absent injunctive relief. Thus, the Court finds that on balance, the risk of injury, as between the parties, is in Defendants' favor. Finally, because of the great need for the proposed improvements and because of the risk of higher assessment costs to all of the citizens of South Wright View Heights, when considering the impact of this ruling upon the public interest, this Court concludes that this ruling *is* in the public interest.

Having so decided, the Court has reached the following conclusions of law:

**39.** The Court notes that Plaintiffs have not introduced any evidence of a technical nature to substantiate their claims.

**40.** Defendants also suggested suits under various tort theories as well as a claim for damages under Ohio Rev.Code § 727.18. In view of the finding that a cause of action exists under the appropriation theory, the Court has refrained from considering any other theories.

**41.** South Wright View Heights residents Jack Nickols and Arville Thomas testified at the hearing that if, in fact, any injury to their property should occur, the amount of damages could be monetarily quantifiable. Arville Thomas assigned a value of $64,000 to the property he believes will be damaged.

## IV. CONCLUSIONS OF LAW

1. Plaintiffs have not established a likelihood of success on the merits of their claims that they were denied the opportunity to participate in the development of the citizen participation plan or the implementation thereof.

2. Plaintiffs have not shown that they will suffer irreparable harm absent injunctive relief.

3. The risk of injury to Defendants, should the Court grant this injunction (higher construction costs) is greater than the risk of injury to Plaintiffs, absent injunctive relief (very little risk of physical property damage). Therefore, the balance of injury between the parties is in favor of Defendants.

4. The ruling will impact favorably on the public interest, because it will permit the construction of necessary public improvements, and will reduce the risk of higher assessment costs to all of the citizens of South Wright View Heights.

5. Plaintiffs have an adequate remedy at law for any injuries they might suffer.

6. The Department of Housing and Urban Development did not act contrary to law or abuse its discretion in approving Fairborn's preapplication or application for funds under the Community Development Block Grant Program.

7. Plaintiffs' request for injunctive relief must be denied due to Plaintiffs' failure to establish the requisites under the four part balancing test of *Roth v. Bank of the Commonwealth*, 583 F.2d 527 (6th Cir.1978), *cert. dismissed*, 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979).

## V. CONFERENCE CALL SET

Counsel listed below will take note that a preliminary pretrial conference will be had, by conference call telephone communication, at 8:10 a.m. on Friday, December 17, 1982, for the purpose of discussing further procedures to be followed in this case.

## APPENDIX A—TEXT OF PUBLIC NOTICES

### APPENDIX A–1

The legal advertisement for the first meeting reads as follows:

### ANNOUNCEMENT OF PUBLIC HEARING

The City of Fairborn is holding a public meeting at 7:00 on Monday, November 24, 1980 at the Fairborn Neighborhood Service Center, 634 Patterson St.

The 1981 Community Development Block Grant application and amendments to the 1980 CDBG will be discussed.

HENRY B. HUNTER
Urban Planner
November 21, 1980

### APPENDIX A–2

The following is the full text of the flyer distributed door to door on November 15, 1980:

### IMPORTANT ANNOUNCEMENT

For All Residents and Property Owners In Central Wright View

The City of Fairborn is requesting a Community Development Block Grant from the U.S. Department of Housing and Urban Development to conduct a neighborhood improvement program.

Among the activities contemplated are:
—Installation of storm sewers
—Street improvements
—Sidewalk improvements
—Grants and low cost loans for home improvements
—Energy conservation
—Job development

A NEIGHBORHOOD PUBLIC MEETING will be held at:

DATE: Monday, November 24, 1980
TIME: 7:00 p.m.
PLACE: Neighborhood Service Center, 634 Patterson St.

All residents and property owners of Central Wright View are urged to attend to learn about Federal grants and express their preferences concerning how the next project should be conducted and what it should cover. The public meeting will discuss an amendment to the 1980 Community Development Block Grant allowing commercial loans.

## APPENDIX A–3

The notice of the second public hearing published in the Fairborn Daily Herald read:

### ANNOUNCEMENT OF PUBLIC HEARING

The City of Fairborn is holding a public meeting at 7:00 p.m. on Monday, December 8, 1980, before City Council at the City Administration Building, 44 West Hebble Avenue.

The proposed 1981 Community Development Block Grant application and amendments to the 1980 CDBG program will be discussed.

Henry B. Hunter
Urban Planner
Dec. 2, 1980

## APPENDIX A–4

The following is the text of the notice of submission published in the Fairborn Daily Herald on January 29, 1981:

### NOTICE OF SUBMISSION OF PREAPPLICATION/APPLICATION

The City of Fairborn has submitted a preapplication to the U.S. Department of Housing and Urban Development requesting $3,000,000 under the Community Development Block Grant Small Cities' Program. A copy of the preapplication is available to interested parties upon request from 8:00 a.m. to 5:00 p.m. weekdays at the reception desk, 44 W. Hebble Avenue, Fairborn, Ohio.

Citizens may submit objections to approval of this preapplication directly to:

Community Planning Division—HUD
200 N. High Street
Columbus, OH 43215

Although HUD will consider objections submitted at any time, such objections should be submitted within 30 days of this notice's publication. HUD will consider citizen objections made only the following grounds:

a) The City's description of needs and objectives is plainly inconsistent with available facts and data.

b) The activities to be undertaken are plainly inappropriate to meeting the needs and objectives identified by the City.

c) The preapplication does not comply with the requirements of applicable law.

d) Proposed activities are otherwise ineligible for funding.

Such objections should include both an identification of the requirements not met, and in the case of (a) the data upon which the objection relies.

January 29, 1981

## APPENDIX A–5

The following notice of the First Public Hearing prior to submission of the full application was published on April 16 and April 23, 1981 in the Fairborn Daily Herald:

### NOTICE OF FIRST PUBLIC HEARING COMMUNITY DEVELOPMENT BLOCK GRANT FUNDS

Notice of Public Hearing is hereby given that the City of Fairborn, Ohio will hold a public hearing at 7:00 p.m., April 21, 1981, in the Fairborn Neighborhood Service Center located at 634 Patterson Street.

The City has been invited to submit a full application for a Comprehensive program under the Community Development Block Grant (Small Cities) Program created by the Housing and Community Development Act of 1980. It is estimated that this full application will be submitted on, or before May 18, 1981 to the Columbus Area Office of the U.S. De-

partment of Housing and Urban Development (HUD).

One purpose of this hearing is to obtain views of the citizens about, and to explain, the following approved activities: Housing Rehabilitation Assistance, Solar Project, Acquisition/Rehabilitation/Resale of Residence, Acquisition, Demolition, Relocation, Commercial Loan Program, Public Improvements, and a Code Enforcement Program. These activities are to be concentrated in the Central Wright View Heights Target Area.

The second purpose of this hearing is to obtain the views of citizens on community development and housing needs and priorities which will be used for the preparation of Fairborn's Housing Assistance Plan which has to be submitted with the full application.

Other topics to be discussed at this meeting are: A proposed amendment to the 1980 Community Development Block Grant Federal Program Requirements, application procedures, methods of citizen input, need for additional meetings, etc.

This meeting is open to all residents of Fairborn and any organization or person desiring to speak on these matters will be afforded an opportunity to be heard.

Henry B. Hunter
Urban Planner

By Order of the City Manager
City of Fairborn, Ohio

April 16, 23, 1981

### APPENDIX A–6

The following is the text of the notice of submission of the full application published in the Fairborn Daily Herald on May 29, 1981:

### NOTICE OF SUBMISSION OF APPLICATION

The City of Fairborn has submitted an application to the U.S. Department of Housing and Urban Development requesting $1,000,000 under the Community Development Block Grant Small Cities' Program. A copy of the application is available to interested parties upon request from 8:00 a.m. to 5:00 p.m. weekdays at the reception desk, 44 W. Hebble Avenue, Fairborn, Ohio.

Citizens may submit objections to approval of this application directly to:

Community Planning Division—HUD
200 N. High Street
Columbus, OH 43215

Although HUD will consider objections submitted at any time, such objections should be submitted within 30 days of this notice's publication. HUD will consider citizen objections made only on the following grounds:

a) The City's description of needs and objectives is plainly inconsistent with available facts and data.

b) The activities to be undertaken are plainly inappropriate to meeting the needs and objectives identified by the City.

c) The application does not comply with the requirements of applicable law.

d) Proposed activities are otherwise ineligible for funding.

Such objections should include both an identification of the requirements not met, and in the case of (a) the data upon which the objection relies.

### APPENDIX B

The text of 24 C.F.R. § 570.431(a) and (b) is as follows:

§ 570.431 Citizen participation requirements for Comprehensive and Single Purpose Grants.

(a) *General.* Each applicant shall provide citizens with an adequate opportunity for meaningful involvement on a continuing basis and for participation in the planning, implementation and assessment of the program. The applicant shall provide adequate information to citizens, hold public hearings at the initial stage of the planning process to obtain views and proposals of citizens, and provide citizens an opportunity to comment on the applicant's community development performance. Nothing in these requirements,

however, shall be construed to restrict the responsibility and authority of the applicant for the development of the application and the execution of its Community Development Plan.

(b) *Written Citizen Participation Plan.* To achieve these goals, each applicant shall prepare and follow a written citizen participation plan that serves as a citizens' guide to interacting with the block grant program in a meaningful way. Citizens shall be involved in the development of, and any changes to the plan. The plan shall remain in effect until all activities assisted under this Subpart are completed or until it is superseded by a new plan. The plan must provide procedures that meet the following requirements:

(1) Provide a process of citizen participation at the communitywide level with regard to the overall application, the Community Development Program, and the assessment of performance where applicable.

(2) Solicit and respond in a timely manner, to views and proposals of citizens, particularly low and moderate income persons, members of minority groups, and residents of blighted areas where activities are proposed. Written responses shall be made to written proposals.

(3) Provide technical assistance to facilitate citizen participation, where requested. The level and type of technical assistance shall be determined by the applicant.

(4) Provide adequate notices of public hearings and the availability of the report on assessment of performance, where applicable, in a timely manner and in such a way as to make them accessible and understandable to all citizens, including non-English speaking persons. The plan must state the number of days prior to a hearing that a notice will be published.

(5) Schedule hearings to obtain citizen views and to respond to citizen proposals at times and locations which permit broad participation, particularly by low- and moderate-income persons, members of minority groups, handicapped persons, and residents of blighted neighborhoods and project areas.

(6) Conduct a minimum of two public hearings at both preapplication and application stages. A public hearing shall be held during both planning processes and a public hearing shall be held prior to the submission of both documents to the HUD Area Office. An exception is provided at paragraph (c)(2)(ii)(A) of this section for subsequent full applications under a multiyear commitment. Citizens shall be given an opportunity to assess performance under previous grants in at least one public hearing at the preapplication and at least one public hearing at the full application stage.

(7) Conduct at least one public hearing during the grant closeout process, prior to submission to HUD of the assessment of performance report, if such a report has not been made and a hearing has not been held concerning performance in the last 12 months.

(8) Provide full public access to program records and information and make affirmative efforts to get adequate information to citizens, especially persons of low and moderate income and residents of blighted neighborhoods and project areas. The citizen participation plan shall identify the information that will be made available to the public by the applicant.

(9) Conduct a minimum of two public hearings on any amendment requiring HUD approval. A public hearing shall be held to consider the merits of the amendment in its formative stages and a public hearing shall be held on the amendment when it is ready for submission. Citizens, particularly affected citizens, shall also be involved in amendments and not requiring prior HUD approval, budget revisions, and changes to the Community Development Program and the Housing Assistance Plan. The methods by which citizens will be involved shall be described in the plan.

(10) Involve citizens in planning, implementing and assessing the Community

Development Program and performance. The methods by which citizens and citizen organizations will be given the opportunity to assess and submit comments on the applicant's community development performance shall be described in the plan.

(11) Advise citizens of the bases and process to be used to submit objections to HUD to the approval of a preapplication or full application.

(12) Ensure low- and moderate-income persons and minorities substantial representation on any advisory committee.

(13) Provide bilingual opportunities at public hearings, when necessary.

(14) Provide written responses to written complaints generally within 15 working days.