**William BOSSERT, et al., Plaintiffs,**

v.

**SPRINGFIELD GROUP, INC., et al., Defendants.**

**No. C-3-83-365.**

United States District Court, S.D. Ohio, W.D.

Jan. 20, 1984.

Michael Catanzaro, Springfield, Ohio, for plaintiffs.

Gerald Kaminski, Asst. U.S. Atty., Dayton, Ohio, for defendant Farmers Home Admin.

Charles Henderson, Springfield, Ohio, for defendant Springfield Group.

Thomas W. Wilson, Asst. Pros. Atty., Springfield, Ohio, for defendant Clark County Bd. of Com'rs.

R. Paul Perkins, Jr., Dayton, Ohio, for defendants Maurice Humphrey, Laura Humphrey, Robert Dibert, Deloris Dibert, David Leedale, Brenda Leedale, Greg White, Lori White, Darryl Yount, Julia Yount, John Gray, Michelle Gray, Minny Walker, Steven Queen, Diana Queen, Jerry Lightner, Deborah Lightner, Michael Lonsway, Linda Lonsway, Gregory Hamilton, Lori Hamilton.

## DECISION AND ENTRY OVERRULING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION; CONFERENCE CALL SET

RICE, District Judge.

This case came to be heard on December 5 and 8, 1983, on Plaintiffs' motion for a preliminary injunction, seeking to enjoin the construction of certain homes in Northridge, a suburban community on the outskirts of Springfield, Ohio. For the reasons outlined below, the Court overrules the motion in its entirety.

Fifty-four Plaintiffs, all homeowners in Northridge, bring suit in the second amended complaint. Named as Defendants are Springfield Group, Inc. (SGI), the Farmers Home Administration (FmHA) of the United States Department of Agriculture, and the Clark County (Ohio) Board of Commissioners. Also named as Defendants, primarily for their status as indispensable parties under Fed.R.Civ.P. 19(a), are 26 individuals who are building, or intend to build, homes near those of the Plaintiffs, with the aid of a Self-Help Technical Assistance Grant administered by SGI. This federal grant, commonly known as the "sweat-equity" program,[1] is authorized under various provisions of the National Housing Act, as amended, 42 U.S.C. § 1490 *et seq.* Under that program, the FmHA may make grants to non-profit corporations, such as SGI, to assist low income individuals in "rural areas" in acquiring land and building homes thereon. *See* 42 U.S.C. §§ 1490c, 1490e.

In their second amended complaint, Plaintiffs allege generally that their properties and property values will be damaged if the "sweat-equity" homes in Northridge are completed. More specifically, Plaintiffs advance five separate causes of action (or grounds in support of the motion for a preliminary injunction), as follows:

(1) SGI does not have the necessary background and experience to administer the Self-Help Grant, as required by the FmHA's regulations, 7 C.F.R. § 1933.404(a)(2)(i) (1983);

(2) SGI failed to demonstrate a need for the self-help housing, and "failed to provide a market-feasibility study," as required by 7 C.F.R. § 1933.406(a) (1983);

(3) the proposed home sites will excessively increase the amount of raw sewage treated by the Northridge Waste Water Treatment Plant, which will contaminate water, cause sewage

1. So-called due to the prospective homeowners contributing their own labor to actually building the homes. *See* 42 U.S.C. § 1490c(a); *Owner-Built Housing Program Flourishes, Using 'Sweat Equity' for Down Payments,* Wall St.J., December 5, 1983, § 2, at 33, cols. 4–6.

backup, and decrease Plaintiffs' property values;

(4) the proposed homes are of such lesser quality than Plaintiffs' homes that the diminution in market value of the Plaintiffs' homes will amount to $9,500 for each home; and

(5) the FmHA improperly designated the Northridge community as a "rural area," as that term is defined in 42 U.S.C. § 1490 and 7 C.F.R. §§ 1933.-403(j) & 1944.10(a) (1983).

The second amended complaint also sets out a "Federal Question Statement," which predicates jurisdiction of this Court on the general federal question statute, 28 U.S.C. § 1331. In that "Statement," Plaintiffs also allege (1) that SGI violated 7 C.F.R. § 404(b) (1983), a conflict-of-interest provision, and (2) that the actions of SGI and the FmHA have resulted in an uncompensated taking of private property, which is forbidden by the Fifth and Fourteenth Amendments to the United States Constitution.[2]

In conformity with Fed.R.Civ.P. 65(d), the Court sets forth its findings of fact and conclusions of law.

## I. FINDINGS OF FACT

Based upon the record, the stipulated facts, and the evidence introduced at the December 5 & 8, 1983, hearings, the Court makes the following findings of fact:

1. Plaintiffs are real property owners of 35 parcels of land, with fully constructed homes thereon, in Northridge, Ohio, an unincorporated community north of the city of Springfield, Ohio. These homes are in subdivisions 18, 18A, 2 and 15 of Northridge, and are adjacent or near to the homes being constructed under the "sweat-equity" program. (Testimony of William Braam, William Bossert; Defendants' ex. 30).

2. SGI is a non-profit Ohio corporation, which entered into a Self-Help Technical Assistance Grant Agreement with the FmHA on September 30, 1982. Under that Agreement, SGI is to receive a total of $197,500 over a two-year period from the date of the Agreement to provide a program of technical and supervisory assistance to aid groups of low income families, in the mutual self-help construction of their homes in Northridge subdivision 18A. (Testimony of Stanley Turner; Defendants' ex. 10 [3]).

3. The FmHA approved SGI's application for a Self-Help Technical Assistance Grant on September 30, 1982. The FmHA determined that the application met the requirements of the statutory provisions and regulations at issue in this case. (Testimony of Stanley Turner, Carl Wagner; Defendants' ex. 10).

4. Northridge Subdivision 18A is located north of Moorefield Road, which runs in an east-west direction north of the city of Springfield. The subdivision is located approximately one mile from the Springfield city limits. Most public services for the subdivision, such as sewer and waste disposal, schools, and roads, are separate from those of the city of Springfield. (Some of these services are administered by Clark County, in which Northridge lies.) The only public service combined with Springfield is the potable water system, in which Clark County purchases the water from Springfield and resells it to subdivision residents. Northridge, as a whole,

---

**2.** It is not clear why these allegations were not set forth as additional causes of action in the second amended complaint. More importantly, Plaintiffs failed to present evidence (or legal argument) in their papers or at the preliminary injunction hearing which directly addressed the "takings" issue. *See Amen v. City of Dearborn,* 718 F.2d 789, 794–95 (6th Cir.1983) (*Amen II*) (discussing requisites of establishing "takings" claim under Fifth Amendment). While Plaintiffs have not necessarily abandoned that claim in this litigation, the Court, at this juncture, is simply unable to address that claim, as a separate cause of action, for purposes of the preliminary injunction motion. *See* 11 C. Wright & A. Miller, Federal Practice & Procedure, § 2949 at 469 (1973) [hereinafter cited as Wright & Miller].

**3.** All counsel have stipulated to the authenticity of Government exhibits 1–23 and Plaintiffs' exhibits A, F, G, H, & L, *see* docs. # 50, 44, as well as to a variety of other documents and facts in this case. (See docs. # 45–49).

contains stores, professional offices, service stations, and other commercial entities. Farm land and other open space lies north and west of subdivision 18A. The population of Northridge, north of Moorefield Road, is undoubtedly less than 2,500.[4] (Testimony of William Bossert, Carl Wagner, Stanley Turner; Plaintiffs' ex. L, Defendants' exs. 25A, 25B, 26; Stipulated Facts, doc. # 49).

5. In May of 1981, Carl Wagner, administrative supervisor for the FmHA over Clark County, prepared a map designating certain areas in Clark County to be "rural" and "non-rural," and those terms are defined in the relevant statutes and regulations. He relied upon census data and his own examination of the character of subdivision 18A, in designating the subdivision (and other areas north of Moorefield Road) as "rural." More specifically, Wagner, in making this decision, drove by car through the area, consulted aerial photographs of the area (prepared by the Department of Agriculture), consulted with officials of the Soil Conservation Service of the Department of Agriculture, the Clark County Engineer, and members of the Clark County Planning Commission, reviewed the 1980 census data for Clark County (and determined that the area of Northridge north of Moorefield Road has less than 2,500 residents), and reviewed FmHA files for Clark County, which indicated that several FmHA loans were made to residents of Northridge. Wagner considered drawing the "rural/non-rural" dividing line at Route 334, which is south of Moorefield Road, and north of which he considered rural in character. He declined to do so, however, since a dividing line at Route 334 would have bisected the Clarence J. Brown, Sr., Reservoir and created administrative difficulties.

(Testimony of Carl Wagner; Defendants' ex. 24).

6. The 1980 Census revealed the population figures:

| | |
|---|---|
| City of Springfield | 72,563 |
| Moorefield Township | 9,823 |
| Northridge | 5,559 |
| Dayton/Springfield Metropolitan Statistical Area | 942,083 |

(Plaintiffs' exs. F & G).

7. Stanley Turner is the Executive Director of SGI, and the authorized representative of SGI concerning the Self-Help Technical Assistance Grant. Mr. Turner has no pecuniary interest in any aspect of the Grant. (Testimony of Stanley Turner; Defendants' ex. 5, pp. 1, 21).

8. SGI has the background and experience, with a proven ability to perform responsibly in the field of mutual self-help housing. SGI has administered three grants or programs for the city of Springfield: (1) a housing rehabilitation program, funded in an amount totalling over one million dollars by a Community Development Block Grant received by the city from the Department of Housing and Urban Development; (2) an Urban Homesteading Program under which SGI receives homes repossessed by the FmHA and makes these homes available to prospective homesteaders who are willing and able to repair and rehabilitate these homes; and (3) a Voluntary Acquisition Program under which SGI acquires, rehabilitates and resells homes which the owners cannot or will not maintain to conform to housing code standards. (Testimony of Stanley Turner; Defendants' ex. 5, pp. 3–4).

9. The application filed by SGI with the FmHA set forth statistical data demonstrating a need for self-help housing in Clark County. More specifically, that data

---

4. The record does not reveal an *exact* figure for the population of Northridge, north of Moorefield Road. However, the 1980 census data does indicate a 9,823 population figure for Moorefield Township, and a 5,559 figure for all of Northridge. *See* Finding of Fact 6, *infra*. Only slightly over 300 of the 2,200 residences in Northridge are located north of Moorefield Road. Stipulated Facts, doc. # 48. It would

seem to follow, as Carl Wagner found, *see* Finding of Fact 5, *infra*, that the total population of 300 plus households would not exceed 2,500. To exceed 2,500, each household would need to average between seven and eight inhabitants, which seems unlikely (although, admittedly, these figures are only *implicit* in the record, i.e., Carl Wagner's testimony).

included information as to new single-family housing construction in Clark County, the income level of County residents, and a description of existing housing conditions in two communities (Limecrest and Crystal Lakes/Medway) within rural Clark County. When SGI filed its grant application, the FmHA had over 500 applications from low income residents from Clark County seeking assistance in the purchase of single-family homes in the County, under the FmHA's "502 program" (i.e., Section 502 of the National Housing Act, 42 U.S.C. § 1472). (Testimony of Stanley Turner; Defendants' ex. 5, pp. 11, 13, 14–16, ex. 12).

10. SGI and the FmHA regarded the area to be served by the Self-Help Technical Assistance Grant as the entirety of Clark County, not merely Northridge (Testimony of Stanley Turner; Defendants' exs. 1, line 10; 5, pp. 11; 10, p. 1).

11. The homes owned by Plaintiffs, *see* Finding of Fact 1, are, for the most part, on lots of no less than 1100 square feet, with the majority of the homes having two-car garages, basements, and brick facades. (Testimony of William Braam, William Bossert; Defendants' ex. 30; stipulated facts, doc. # 48).

12. Those homes of Plaintiffs in subdivisions 18 and 18A of Northridge were built by Hoppes Development Company and Hoppes Builders, Inc. Mr. L. Edwin Hoppes, chairman of the board of those companies, told at least one of the Plaintiffs that no homes smaller than the homes of the Plaintiffs would be built in Northridge subdivision 18A. (Testimony of William Bossert; stipulated facts, doc. # 48).

13. About 315 homes have been constructed north of Moorefield Road in Northridge subdivisions 18, 18A, 2, and 15, excluding the residences of the Defendant homeowners. Of these homes, about 101 were constructed with less than 1100 square feet of living space, exclusive of garage, porches and basements. (Stipulated Facts, doc. # 48).

14. The Defendant homeowners are persons of low to moderate incomes. At least

six homes are being constructed by several of said Defendants in Northridge subdivision 18A; the remaining Defendants intend further construction of homes in that subdivision. To date, all such construction has complied with the covenants and restrictions running with the platted parcels in subdivision 18A, and has complied with all applicable zoning, building, and electrical codes. (Testimony of Stanley Turner; Stipulated Facts, doc. # 49, ¶ 3; Defendants' exs. 5 & 8).

15. The cost of acquiring the real estate owned by the homeowner Defendants, and the cost of construction thereon, is funded by mortgages obtained by said Defendants from the FmHA under § 502 of the National Housing Act, 42 U.S.C. § 1472. That program is separate from the self-help technical assistance grant program. The Defendant homeowners purchased lots in Northridge subdivision 18A from the Hoppes Development Company for about $11,700 per lot. (Testimony of Carl Wagner, Stanley Turner).

16. Each of the Defendant homeowners have executed promissory notes payable to the order of FmHA, which notes are secured by a mortgage on the real estate owned by the Defendant homeowners in Northridge subdivision 18A. At least eight (8) of these Defendants are required to begin making payments on their mortgage notes to FmHA on April 1, 1984. Other homeowner Defendants are required to begin payments on their respective mortgage notes at varying dates in July of 1984. The payments are scheduled to be made whether or not construction of the homes (or continuance of the self-help technical assistance grant) goes forward. (Testimony of Carl Wagner; Defendants' ex. 27; Stipulated Facts, doc. # 46, ¶¶ 3–4).

17. The homes of the Defendant homeowners, being constructed under the supervision of SGI, are single-floor brick structures with insulated crawl space foundation, containing 1134 square feet of living space exclusive of porches and garage, with a value (per home) of approximately $46,000. While slightly smaller than many

of the other homes in Northridge, said homes, while not identical, are similar in outward appearance to other homes in Northridge. (Testimony of Max McDorman, Richard Henry).

18. The FmHA sought and received assurances from the Clark County Engineer and the Ohio Environmental Protection Agency that the Northridge Waste Water Treatment Plant has the capability to handle and process the additional sewage resulting from the homes to be constructed by the Defendant homeowners. (Defendants' exs. 11; 12, pp. 2, 5–6, 7; 15).

19. The construction of the homes under the § 502 Program and the Self-Help Technical Assistance Grant will cause some diminution in market value of the Plaintiffs' homes, particularly those homes in Northridge Subdivision 18A. The diminution in market value will range from several thousand dollars to as much as ten thousand dollars. These dollar amounts are ascertainable and susceptible to fairly definite calculation. (Testimony of Susan Smedley, Max McDorman).

20. The diminution in market value of Plaintiffs' homes, *see* Finding of Fact 19, is not due to any *single* cause. Rather, it flows from *several* factors, among which are (1) the repeated failure of school bond issues, (2) the general sluggish economic conditions, (3) the uncertainty as to the continued presence of the International Harvester, Inc., plant in Springfield, (4) the adverse publicity generated by the filing of the instant lawsuit, and (5) the size and quality of the homes under construction, and to be constructed, by the Defendant homeowners. (Testimony of Max McDorman, Susan Smedley, Richard Henry).

21. Should an injunction *not* issue in this case, Plaintiffs will not be *irreparably* harmed, since the damages they assert (i.e., loss of market value of their homes), to the extent it flows from Defendants' conduct, are quantifiable and (potentially) recoverable through subsequent legal action. See Findings of Fact 19–20. Moreover, should construction of *unfinished* homes *now* be enjoined, it will even further decrease the market value of Plaintiffs' homes, as compared to the decrease attributable to completely constructed homes. (Testimony of Susan Smedley).

22. Should an injunction issue in this case, the funding provided by the Self-Help Technical Assistance Grant will be terminated, which will eliminate about 37 per cent of the annual budget of SGI, cause the layoff of three SGI employees, and jeopardize its ability to meet its obligations under its new lease of office space. (Testimony of Stanley Turner; Stipulated Facts, doc. # 47).

23. Should an injunction issue in this case, the Defendant homeowners will suffer economic and other injury, in that they will be deprived of the opportunity to own, construct, and live in single-family housing in Clark County, and some or all of them will nevertheless be required to continue payments on their mortgage. (Inferred from Finding of Facts 14, 16, 22).

24. Any harm to the Plaintiffs which may result should the Court not issue the injunction is outweighed by the harm which would result to Defendants (particularly the Defendant homeowners) if the injunction *were* issued. See Findings of Fact 14, 19–23. In addition, should the injunction not issue, the public interest, as outlined by Congress, will be served by the continuing availability of Self-Help Technical Assistance funds to low income individuals. *See* 42 U.S.C. § 1490c(a); 7 C.F.R. § 1933.401 (1983).

## II. CONCLUSIONS OF LAW

1. Plaintiffs have failed to establish a substantial likelihood or probability of success on the merits of the causes of action advanced in their second amended complaint.

2. Plaintiffs have not shown that they will suffer irreparable harm absent injunctive relief.

3. The balance of injury between the parties is in favor of the Defendants.

4. The Court's decision *not* to issue an injunction will impact favorably on the pub-

lic interest, because it will permit continued funding and operation of the Self-Help Technical Assistance Grant.

5. Plaintiffs' motion for injunctive relief must be overruled, due to their having failed to establish any of the four requisites for the issuance of a preliminary injunction under case law in the Sixth Circuit.

6. Mr. L. Edwin Hoppes is not an "indispensible" party in this lawsuit, as that term is defined in Fed.R.Civ.P. 19(a).

## III. DISCUSSION

In this Circuit, it is well established that a district court, in exercising its discretion to sustain or to overrule a motion for a preliminary injunction, must consider four factors:

(1) Whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

(2) Whether the plaintiff has shown irreparable injury;

(3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

(4) Whether the public interest would be served by issuing a preliminary injunction.

*See, Warner v. Central Trust Co., N.A.,* 715 F.2d 1121, 1123 (6th Cir.1983); *American Motors Sales Corp. v. Runke,* 708 F.2d 202, 205 (6th Cir.1983); *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 102 (6th Cir.1982); *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 537–38 (6th Cir.1978), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979); *Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977).

The Court will first address whether Plaintiffs have "shown a strong or substantial likelihood or probability of success on the merits." Secondly, the Court will discuss the other three requisites necessary to justify issuance of a preliminary injunction. Finally, the Court will briefly address the alleged status of L. Edwin Hoppes as an "indispensible" party under Fed.R.Civ.P. 19(a).

## A. LIKELIHOOD OF SUCCESS ON THE MERITS

In order to establish a "substantial likelihood or probability of success on the merits," Plaintiffs must demonstrate that the FmHA's approval of SGI's Self-Help Technical Assistance Grant, under 42 U.S.C. §§ 1490c(b), 1490e(a)–(b), as a "final agency action" was either "arbitrary, capricious and an abuse of discretion, or otherwise not in accordance with law," or that the action failed to meet statutory, procedural or constitutional requirements. 5 U.S.C. § 706(2)(A)–(D). This inquiry does not partake of a *de novo* review by this Court substituting its judgment for that of the agency; instead, the Court only examines the agency's decision, and articulated reasons therefor, to determine if the Administrative Procedure Act, 5 U.S.C. § 706, has been complied with. *See generally, Motor Vehicle Manufacturers Assoc. v. State Farm Mutual Automobile Ins. Co.,* —— U.S. ——, 103 S.Ct. 2856, 2865–67, 77 L.Ed.2d 443 (1983) (*Motor Vehicle*); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 414–20, 91 S.Ct. 814, 822–25, 28 L.Ed.2d 136 (1971); *Citizens Committee Against Route 675 v. Lewis,* 542 F.Supp. 496, 521 (S.D.Ohio 1982). In the context of a motion for a preliminary injunction, Plaintiffs must show a "substantial likelihood or probability" that the FmHA's actions were unlawful.

As previously outlined, Plaintiffs advance a number of assertions supporting their claim that the FmHA's approval of the grant to SGI was improper. Those assertions will be considered seriatim.

## 1. BACKGROUND AND EXPERIENCE

The regulations governing the Self-Help Technical Assistance program require, *inter alia,* that SGI

[h]ave necessary background and experience with proven ability to perform responsibly in the field of mutual self-help or other business management or administrative ventures which indicate an abili-

ty to perform responsibly in the field of mutual self-help.

7 C.F.R. § 1933.404(a)(2)(i) (1983). As the FmHA acknowledges, FmHA memorandum, doc. #59, p. 5, SGI did not have background or experience in the field of mutual self-help, or sweat-equity, housing. However, as the record amply demonstrates, *see* Finding of Fact 8, SGI has experience, in the words of the regulation, in *"other* business management" ventures, which "indicate an ability to perform responsibly in the field of mutual self-help." These other ventures were analogous, both in subject matter and general location, to the Northridge "sweat-equity" project currently under review. Accordingly, the FmHA's determination that SGI met the requirements of the above-listed regulation is not arbitrary, capricious, or otherwise improper.

## 2. NEED FOR SELF–HELP HOUSING

Another applicable regulation provides as follows:

> An agreement may be approved for an eligible applicant when the following conditions are present:

> (a) A need clearly exists in the area for self-help housing. The applicant must provide information such as census materials, local planning studies, surveys, or other readily available information such as census materials, local planning studies, surveys, or other readily available information, indicating a need in the area for housing of the type and cost to be provided by the proposed self-help TA program for low income families that lack adequate housing or live in housing that is considered to be deteriorating, delapidated, overcrowded, and lacking some or all plumbing facilities. The applicant must also provide evidence that at least as many families as the number of homes to be built have been contacted and are interested in and appear to be eligible to participate in the self-help program. A list of such families consisting of names and addresses will be provided.

7 C.F.R. § 406(a) (1983). Plaintiffs contend that SGI failed to satisfy this regulation, since it did not provide a "market-feasibility study," and defined too broadly the "area" referred to in the regulation (i.e., the whole of Clark County instead of just Northridge).

This Court cannot agree with either position. First, the regulation simply does not require an applicant, like SGI, to submit a "market-feasibility study" to the FmHA. Of course, the information which the regulation *does* require adds up, in effect, to a "market-feasibility study." The record demonstrates that SGI provided the data required by the regulation. *See* Finding of Fact 9.

Second, Plaintiffs argue that the "area" where the need for self-help housing must be shown is not a county-wide locale, but rather the specific place (i.e., Northridge) where the self-help housing is to be eventually sited. Unfortunately, neither the regulation itself, nor the definitions for that particular set of regulations, 7 C.F.R. § 1933.403 (1983), specifically addresses the scope of "area." In an effort to supply the missing definition, counsel point to other uses of the word "area" in the regulations. Defendants cite 7 C.F.R. § 1933.409 (c) (1983), setting forth further requirements for recipients of Technical Assistance Funds, which states that the "area to be served" by a grant will "generally . . . not include more than the area of a single county . . . ." On the other hand, Plaintiffs cite 7 C.F.R. § 1944.19(a)(2) (1983), a regulation discussed in greater detail below, which defines for grant purposes a "rural area" as, *inter alia,* "any town, village, city or place, including the immediately adjacent densely settled area, which is not part of or associated with an urban area. . . ."

It is somewhat difficult to draw any definitive conclusion from the use of "area" by these analogous regulations. What conclusions can be drawn, however, support Defendants' interpretation. The regulation cited by Defendants obviously contemplates that an "area" may encompass as much as the entirety of, or, indeed, more

than, a single county. Plaintiffs' regulation, at first blush, seems to limit "area" to a "town, village or city." But that regulation is primarily directed toward defining the scope of "rural" (i.e., the character of a place) rather than the geographic *size* of a place. Moreover, the regulation cited by Plaintiffs *also* refers to a "rural area" as an "open country which is not part of or associated with an urban area...." 7 C.F.R. § 1944.10(a) (1983). These regulations simply do not limit "area" to the specific place where the self-help housing is eventually sited.

■■■ The FmHA and SGI regarded the area to be served as all of Clark County. *See* Finding of Fact 10. Principles of statutory construction support this interpretation. Unless otherwise defined, the words making up regulations, as in statutes, *e.g.*, *Russello v. United States*, — U.S. —, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983); *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982), should be given "their ordinary, contemporary, common meaning." *Nickols v. Pierce*, 556 F.Supp. 1280, 1292 (S.D.Ohio 1982). However, the meaning of "area" is, of course, quite broad, and no one particular definition can be ascribed to the word. *See* Webster's Third New International Dictionary 155 (1976).[5] In these circumstances, the normal deference due an agency's application and interpretation of its own regulations, *see PBGC v. Dickens*, 719 F.2d 146, 150 (6th Cir.1983); *Shaffer v. Block*, 705 F.2d 805, 811 n. 7 (6th Cir.1983), is entitled to great weight. Accordingly, the Court holds that the FmHA's determination that SGI met the requirements of the above-listed regulation is not arbitrary, capricious, or otherwise improper.

### 3. CONFLICT OF INTEREST

Another regulation governing self-help grants from the FmHA states that the

"authorized representative" of the applicant (i.e., Stanley Turner of SGI) shall

> have no pecuniary interest in the award of any engineering, architectural, or construction contracts, purchase of the necessary equipment, or purchase of development of the land.

7 C.F.R. § 1933.404(b) (1983).

The entirety of Plaintiffs' allegations on this point, found in the second amended complaint, are that SGI's "board member was a local realtor who obtained the site from Hoppes Development Corporation and at the time had a financial interest in obtaining the site, namely a real estate commission." This board member was not named in the complaint, and Plaintiffs did not present any evidence on this issue at the hearing. However, even assuming the validity of the allegations, they do not aid Plaintiffs. The regulation only extends to the "authorized representative" of SGI, not to any "board member." The record herein demonstrates that Stanley Turner had no pecuniary interest in any aspect of the Self-Help Technical Assistance Grant under review in this case. *See* Finding of Fact 7. Accordingly, the Court holds that the FmHA's determination, that SGI did not violate the above-listed regulation, is not arbitrary, capricious, or otherwise improper.

### 4. OVERLOADING OF SEWAGE FACILITIES

In their third cause of action in the second amended complaint, Plaintiffs allege that the self-help homes will increase the raw sewage processed by the Northridge Waste Water Treatment Plant, that said Plant cannot handle the increase, that the resultant sewage backup will damage Plaintiffs' homes, and that Defendants have failed to gather sufficient information

---

5. The "common meaning" rule need not be followed if there is legislative history to the contrary. *Russello v. United States, supra.* However, the parties did not cite, nor did the Court uncover in its own research, any legislative history, or commentary accompanying the promulgation of the federal regulation in question, which supports one or the other interpretation of "area." *See generally,* H.R.Rep. No. 365, 89th Cong., 1st Sess., *reprinted in* [1965] U.S.Code Cong. & Ad.News 2614, 2662; H.R.Conf.Rep. No. 679, 89th Cong., 1st Sess., *reprinted in* [1965] U.S.Code Cong. & Ad.News 2696, 2708.

regarding the capacity of the Plant. Plaintiffs did not cite any statute or regulation which these alleged actions might have violated. While Plaintiffs did place in the record the substance of a report which recommended changes in the Northridge sewer system, Stipulated Facts, doc. # 49, ¶ 1, Defendants established that the FmHA received assurances from public officials that the Plant could handle additional capacity from the self-help homes. *See* Finding of Fact 18. More importantly, this Court ruled, during the previous preliminary injunction hearing on the original complaint,[6] that damages resulting from a sewage backup were quantifiable and could not form the basis for equitable, injunctive relief. The Court sees no reason to change that decision, and Plaintiffs have not argued that the Court should do so.

## 5. RURAL DESIGNATION

Finally, the Court reaches what is Plaintiffs' most strongly pressed argument, namely, that SGI and the FmHA erred in designating the Northridge community as a "rural area" eligible for a Self-Help Technical Assistance Grant. The statute provides that self-help funds can only be used in "rural areas." 42 U.S.C. §§ 1490a(b), 1490c(a), 1490e(a)–(b). The statute also defines, in pertinent part, "rural" or "rural area" as

> any place, town, village, or city which is not part of or associated with an urban area and which (1) has a population not in excess of 2,500 inhabitants, or (2) has a population in excess of 2,500 but not in

excess of 10,000 if it is rural in character. . . .

42 U.S.C. § 1490. "Rural area" is defined in the regulation tracking the statutory language, as follows:

> (a) For the purposes of this subpart, a rural area is:
>
> > (1) Open country which is not part of or associated with an urban area, or
> >
> > (2) Any town, village, city or place, including the immediately adjacent densely settled area, which is not part of or associated with an urban area and which:
> >
> > > (i) Has a population not in excess of 10,000 if it is rural in character. . . .

7 C.F.R. § 1944.10(a) (1983) (incorporated by reference in 7 C.F.R. § 1933.403(j) (1983)). The regulation goes on to enumerate a number of factors to consider in making the "urban/rural" determination, including the presence of "open spaces" between the rural and "densely populated section of any adjacent urban area," the presence of separate school and utility systems, the place of official boundaries, and the latest census data. 7 C.F.R. § 1944.-10(b)–(d) (1983).[7]

Plaintiffs vigorously argue that the FmHA (through Carl Wagner) misapplied the statute and regulations when it designated Northridge as a "rural" area. More specifically, they contend that Northridge should be considered, in and of itself, an "urban" area or, at the very least, con-

---

**6.** The Court eventually overruled that motion for a preliminary injunction since Plaintiffs had failed to join the defendant homeowners as indispensable parties under Fed.R.Civ.P. 19.

**7.** The factors of separate school systems or utilities is found in 7 C.F.R. § 1944.10(b)(2) (1983), in force at the time of the FmHA's decision (in 1982) under review herein. That regulation as a whole had been redesignated and revised later in 1981, *see* 46 Fed.Reg. 61988 (1981), with comments invited. A final version of the rule was adopted early in 1983, *see* 48 Fed.Reg. 197 (1983), with virtually no changes to the regulations at issue in this case. However, the FmHA did drop § 1944.10(b)(2) entirely, since comments "were received that this section is confus-

ing and unnecessary. It adds no definite or objective measure for determining urban and should be removed." 48 Fed.Reg. at 199. While later changes in a regulation may, in some circumstances, shed light on the meaning of earlier language, *see Jewett v. Commissioner,* 455 U.S. 305, 313–16, 102 S.Ct. 1082, 1088–90, 71 L.Ed.2d 170 (1982), the change to 7 C.F.R. § 1944.10(b) does little to change, one way or another, the application of the entirety of the regulation to the FmHA decision under review. If anything, the change only underscores the view, found in the balance of the regulation, that the "urban/rural" determination turns on the combination of several factors, rather than making one factor dispositive.

sidered "associated with" an urban area (i.e., the city of Springfield).

While Plaintiffs' arguments are not entirely without force, the Court holds that the FmHA's contrary determination was not arbitrary, capricious or otherwise improper. The statute and regulation essentially sets up a two-part, disjunctive test to determine the urban/rural designation. If "any place, town, village, or city" has a population of less than 2,500 people, it can be a "rural area" if it "is not part of or associated with an urban area." If a "place, town, village, or city" has a population between 2,500 and 10,000, then it can be a "rural area" if "it is rural in character." [8]

There is little, if any, dispute between the parties as to the physical characteristics of Northridge, or the steps Carl Wagner took in designating Northridge as a "rural" area. Findings of Fact 4–5. The parties, of course, dispute the *significance* of those characteristics, and the propriety of the conclusion which Wagner reached. Wagner found that the population of Northridge, north of Moorefield road, was less than 2,500. He further found, based on personal investigation and review of relevant data, that Northridge was "not part of or associated with" the city of Springfield. *Id.* The evidence concerning Northridge certainly is not unequivocal in nature. Conceivably, that evidence, *see* Finding of Fact 4, *might* support a determination that Northridge, in whole or in part, is urban in character. By the same token, however, that evidence supports the FmHA's judgment. The distance from the city of Springfield, the separate services utilized by Northridge, the open spaces around parts of Northridge, and the population of

Northridge all support the FmHA's finding that Northridge is "not part of or associated with" Springfield. These same factors would also support a determination that Northridge "is rural in character," if the population was between 2,500 and 10,000.[9] *Cf.* footnote four, *supra*. In short, the evidence regarding Northridge is not *definitive* in one direction or the other. However, the Court cannot hold that the FmHA's decision was arbitrary or capricious, since its decision does not run "counter to the evidence before the agency," nor is it "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle*, 103 S.Ct. at 2867. This Court, or another decision-maker, *may* have drawn the urban/rural line differently than did Carl Wagner. But as noted above, this Court may not substitute its judgment for that of the FmHA. For these reasons, the FmHA's decision regarding the rural designation of Northridge was not arbitrary, capricious, or otherwise improper.

## B. OTHER FACTORS CONCERNING PRELIMINARY INJUNCTIVE RELIEF

The Court having determined that Plaintiffs failed to satisfy the first prong of the test for a preliminary injunction (that of showing a strong or substantial likelihood or probability of success on the merits), it is not necessary, strictly speaking, to address the remaining three parts of the test to conclude that Plaintiffs are not entitled to the preliminary relief they seek. *See Warner v. Central Trust Co., N.A.*, 715 F.2d at 1124. However, in the interests of completing the record, the Court will address those other factors. The Court con-

8. Somewhat different criteria apply if the area has more than 10,000 inhabitants. *See* 42 U.S.C. § 1490; 7 C.F.R. § 1944.10(a)(2)(ii), (e) (1983). Those criteria do not apply to this case, since whatever the exact population of Northridge may be, it is clearly *under* 10,000. *See* Finding of Fact 4, 6; footnote four, *supra*.

9. The Court makes this statement with some caution since, as the Court understands it, the FmHA did not expressly rely on the second part

of the disjunctive test (i.e., that Northridge, north of Moorefield Road, had a population between 2,500 and 10,000, requiring the area to be "rural in character"). *Cf. Motor Vehicle*, 103 S.Ct. at 2870 ("[c]ourts may not accept ... counsel's *post hoc* rationalizations for agency action .... It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.") (citations omitted).

cludes that these remaining factors also run in favor of the Defendants.

Regarding the second factor—the presence of irreparable injury—there is evidence that the damage (diminution in market value) which the Plaintiffs' homes are allegedly suffering (or will suffer) is capable of being quantified. *See* Finding of Fact 19. Such damages, to the extent they are attributable at all to the actions of the Defendants, *cf.* Finding of Fact 20, can arguably be recouped, as suggested by Defendants, *see* FmHA Memorandum, doc. # 59, p. 19, in this Court under the Tucker Act, 28 U.S.C. § 1346, or the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* Nor would other avenues of relief, in this Court and/or state court, necessarily be ruled out. *See Nickols v. Pierce*, 556 F.Supp. at 1296; footnote two, *supra*. It is also worth noting that, in the present procedural posture of the case, the issuance of the injunction Plaintiffs seek will not necessarily halt construction of the self-help homes. Plaintiffs have only sought to enjoin expenditure of self-help funds, *not* of the § 502 funds by which the homeowners actually purchase the lots and building materials, and pay any sub-contractors. *See* Finding of Fact 15. Presumably, Defendants could continue to build without the self-help funds. It could be said that, in effect, the issuance of an injunction would not necessarily have a "causal connection" in abating the damage Plaintiffs allegedly are suffering. *See Lugo v. Miller*, 640 F.2d 823, 828 (6th Cir.1981).

Regarding the third factor—whether an injunction would cause substantial harm to others—the record indicates that the Defendants SGI and homeowners will suffer economic harm. *See* Findings of Fact 22–23. The harm which may be suffered by the homeowners is particularly weighty, since it would deprive some or all of them of the opportunity to build and own single-family housing. The harm which Defendants may suffer outweighs the somewhat speculative (but quantifiable) harm the Plaintiffs may suffer should an injunction not issue. Finding of Fact 24. In this regard, it is worthy of note that enjoining the construction of *partially* finished homes will cause the market value of Plaintiffs' homes to decrease even more than if the self-help homes are permitted to be furnished. Finding of Fact 21.[10]

Regarding the fourth and final factor—whether the public interest would be served by issuing an injunction—there are two important interests involved. As Plaintiffs emphasize, there is certainly a public interest in requiring public funds to be spent lawfully. Likewise, as Defendants point out, the public interest is served by effectuating the intent of Congress to provide self-help funds to eligible individuals. On balance, however, and keeping in mind that the Court has concluded that the self-help funds *are* being spent lawfully, the Court concludes that the public interest would not be served by issuing an injunction. *See* Finding of Fact 24.

■ For all of these reasons, the Court declines to issue a preliminary injunction.

## C. HOPPES AS AN INDISPENSABLE PARTY

■ Mr. L. Edwin Hoppes is the chairman of the board of two companies which constructed Plaintiffs' homes, and from which the Defendant homeowners purchased their lots. He apparently told at least one of the Plaintiffs that no homes, smaller than those of the Plaintiffs, would be built. *See* Findings of Fact 12, 15. In their post-hearing memorandum, Defendants now argue that Hoppes is an indis-

---

**10.** One cannot ascribe *too much* to this reasoning, however. Assuming Defendants were acting unlawfully, it would seem unfair, or inequitable, to allow them to literally build their way, by mere passage of time, into a position where it is difficult to dislodge them. *Cf.* Wright & Miller, *supra* note 2, § 2946 (discussing "clean hands" doctrine in issuing injunctions). Plain-

tiffs place great weight on this and other facts showing that Defendants have gone forward with the sweat-equity project despite the pendency of this lawsuit. Plaintiffs' Post-Trial Memorandum, doc. # 54. Of course, this factor is but *one* this Court must consider in determining whether or not to issue an injunction.

pensable party, under Fed.R.Civ.P. 19(a). If true, Hoppes would have to be joined as a party, or the lawsuit would have to be dismissed. Rule 19(b).

However, Defendants have only advanced this argument in the most conclusory manner. They point to no facts indicating that Hoppes is a party that must be joined under Rule 19(a). In particular, the Court notes that the relief Plaintiffs seek can be given without his presence as a party, Rule 19(a)(1), and it does not appear that any "interest" he has may go unprotected, or subject those already parties to inconsistent obligations. Rule 19(a)(2). Hoppes' interest simply does not approach that of, *e.g.*, the Defendant homeowners, whom the court previously determined to be indispensable parties. *See* footnote 6, *supra.* Defendants have the burden of demonstrating that Hoppes is an indispensable party. *See NLRB v. Doug Neal Management Co.*, 620 F.2d 1133, 1139–40 (6th Cir.1980); *Boles v. Greenville Housing Authority*, 468 F.2d 476, 478 (6th Cir.1972). Defendants have not met that burden, and the Court concludes that, in the present state of the record, Hoppes is not an indispensable party.

## IV. CONCLUSION

For all of these reasons, the Court declines to sustain Plaintiffs' motion for a preliminary injunction. The principal reason for this conclusion, as outlined above, is that the FmHA's decision to designate the Northridge area as "rural" is not arbitrary, capricious, or otherwise unlawful. Whether this Court, or any one else, might have reached a different decision based upon an independent review of the facts is not the appropriate inquiry.

The gravamen of Plaintiffs' Complaint in this case seems to be that the sweat-equity homes simply "do not look good." *See, e.g.*, testimony of William Braam. While the Court has held that Plaintiffs are not entitled to injunctive relief, the Court hopes that SGI and the sweat-equity homeowners will continue their efforts to construct homes in a proper, and aesthetically pleas-

ing, manner, so as to lessen the need for lawsuits of this type.

Counsel will take note that a conference call will be held on Monday, February 6, 1984, at 8:35 a.m., for the purpose of discussing further procedures in this case.